Rachel HICKERSON, Derek Jones, Ty McConnell, and Elliot Stamler, Plaintiffs–Appellants,

Amsterdam Video Inc., A & X Entertainment Inc., d/b/a Playpen II, Adult Video, Inc., Ascot Space Amusement, Inc., d/b/a Ascot Theatre, Big Apple Cinemas Inc., d/b/a Show Follies Theater, Brett Distributors, Inc., d/b/a Media Distributors, Capri Cinema Inc., Capwell Entertainment, Inc., d/b/a Legz Diamond's Playhouse, Church Street Cafe Inc., d/b/a Baby Doll Lounge, College Pt. Rest. Corp., d/b/a Gallagher's II, Crazy Fantasy Video, Inc., Cupid's Treasures, Inc., d/b/a Banana Video and Unicorn, Dara Distributors Inc., d/b/a Love Shack, Desire Video Inc., E & A Books, Inc., E & A Video and Magazine Inc., Ed–Mart Bar & Grill Inc., d/b/a Penny Whistle, For the People Theatres of N.Y., Inc., d/b/a Fair Theatre, Four Keys Enterprises, Inc., d/b/a Hollywood Peepshows, Fourteenth St. Enterprises Inc., d/b/a All Male Adult Video, Fun City Video Corp., G & D Merchandise Corp., d/b/a Peepland, Gotham Exhibitor Inc., d/b/a Peep O Rama, Helen Wolff Ltd., d/b/a Come Again, I.S. Sultars Inc., J & J Tummy Yummies Corp., d/b/a Naked City, JGJ Merchandise Corp., d/b/a Peepland/Valentina's II, JHM Video Corp., JUM Operating Corp., d/b/a Peepland, JVR Video Center Inc., d/b/a Playground, Kinematics Merchandising & Distributors, Inc., d/b/a Kinematics, Kisma Video, Inc., L & T Video, Inc., d/b/a Badlands Adult Video, Madeline D'Anthony Ent. Inc., d/b/a Harmony Theatre, Manhattan Video Inc., Marquis Video Inc., d/b/a Marquis Video, Mirage Productions Inc., d/b/a Love Shack, Montana Holdings Inc., d/b/a Runway 69, Nawan Entertainment Inc., d/b/a Euro World, Nilupul Video. Inc., N.R.S. Video Inc., N.Y. Video Inc., d/b/a Love Shack, Pabon Theatre Corp., d/b/a Eros Theatre, Peregrine Enterprises, Inc., d/b/a Paradise Club, R.E.J.M., Inc., d/b/a Big Top, Ron Bob Pub Inc., d/b/a Gallagher's, Sami's Video Warehouse, d/b/a Warehouse on the Block, LTD, Serendib Video Inc., d/b/a Serendib Video, SPH Video Corp., Star Distributors, LTD, Statewide Video Inc., Steam Heat Inc., STS Video Inc., d/b/a Adult Video, Suemar Video, Inc., d/b/a Goodtime Video, Third Avenue Entertainment Inc., d/b/a XXX Video, Thunder Video Inc., Town Video Sales, Inc., d/b/a Les Hommes Book Shop, Video, Video, Video, Inc., Video 30 of Queens Inc., d/b/a Ecsxxxtasy Video, West Video Inc., Zideo Video Inc., 21 Ann Street Corp., d/b/a Ann Street Adult Entertainment, 130 C Street Corp., d/b/a Christopher Street Book Shop, 155 Video Center Corp., d/b/a Peepworld, 300 Book Center, 303 W. 42nd Street Enterprises Inc., d/b/a Show World, 323 Canal St. Inc., 325 W. 45th St. Rest. Corp., d/b/a Private Eyes, 35–30 38th St. Corp., d/b/a Cityscape, 412 8th Ave. Corp., d/b/a Nude New York City, 45–08 Vernon Blvd. Corp., d/b/a Riverhead Inn, 603 Video Inc., 610 Video Store Inc., 691 8th Avenue Corp., 691 Video Center Corp., 693 Video Corp., d/b/a TNL Video, 711 Associates Ltd., d/b/a Peepland, 729 6th Avenue Corp., d/b/a Billy's Topless, 733A Corp., d/b/a Video Palace, 763 Video Store Inc., 777–779 8th Ave. Corp., d/b/a Hollywood Twin, 81–22 Baxter Ave. Lounge Inc., d/b/a ILDA's Place II, Plaintiffs–Appellants,

v.

The CITY OF NEW YORK, Hon. Rudolph W. Giuliani, as Mayor of the City of New York, Joseph B. Rose, as Director of City Planning, Department of City Planning of the City of New York, and Gaston Silva, as Commissioner of Buildings, Department of Buildings of the City of New York, Defendants–Appellees,

Times Square Business Improvement District, Center for the Community Interest, Bellaire/Bell–Vill Civic Association, Bnos Israel Girls' School, Bowne Park Civic Association, Briarwood Community Association, Bronx Community Board # 12, Brooklyn Civil Council, Brooklyn

Tenants Council, Cardinal Spellman High School, Coal tion of United Residents for a Safer Environment, College Point Board of Trade, Committee for a Better and Safer Nostrand Avenue, Communities of Masbeth and Elmhurst Together, Community School District 21 Presidents' Council, Congregation Bnai Shloima Zalman, Crown Heights Taxpayers and Civic Association, Douglaston Civic Association, East Midwood Neighborhood Association, Councilmember Andrew Eristoff, Grand Central Partnership, Holliswood Civic Association, Hudde Junior High School Parents Association, Jackson Heights Community Development Corporation, Kings Highway District Management Association, Kingsway Jewish Center; Lawyers' Committee on Violence, Manhattan Terrace Civic Association, Councilmember Helen Marshall, Midwood Civic Action Council Inc., New Northern Boulevard Business Association, Northern Boulevard Merchants' Association, 100–299 East 77th Street Block Association, Prospect Park Yeshiva, Queens Braddock Civic Association, Queens Village Civic Association, Real Estate Board of New York, Residents Against Street Prostitution, Rosedale Block Association, Rosedale Civic Association, Councilmember John Sabini, 34th Street Partnership, United Civic Council of Queens, United Community Civic Association, Councilmember Anthony Weiner, West 45th Street Block Association, West 47th/West 48th Street Block Association and West 90's/West 100's Neighborhood Coalition, Defendants–Respondents–Intervenors–Appellees.

Dockets Nos. 98–7269, 98–7270.

United States Court of Appeals,
Second Circuit.

Argued April 29, 1998.

Decided June 3, 1998.

Herald Price Fahringer, Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, LLP, New York City (Erica T. Dubno, Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, LLP; J. Michael Murray, Berkman, Gordon, Murray & DeVan, of counsel), for Plaintiffs–Appellants Amsterdam Video, Inc., et al.

Beth Haroules, New York Civil Liberties Union Foundation, New York City (Arthur N. Eisenberg, Norman Siegel, New York Civil Liberties Union Foundation, of counsel), for Plaintiffs–Appellants Rachel Hickerson, et al.

Leonard J. Koerner, Office of the Corporation Counsel of the City of New York, New York City (Michael D. Hess, Corporation Counsel of the City of New York, Gabriel Taussig, Elizabeth S. Natrella, of counsel), for Defendants–Appellees.

Frederick A.O. Schwarz, Jr., Cravath, Swaine & Moore, New York City, for Defendant–Respondent– Intervenor–Appellee Times Square Business Improvement District.

Wayne A. Cross, Dewey Ballantine LLP, New York City, for Defendants–Respondents–Intervenors–Appellees Center for the Community Interest, et al.

Before: VAN GRAAFEILAND, MESKILL, and CABRANES, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

This case concerns an amendment to the Zoning Resolution of the City of New York (the "Zoning Amendment") regulating the zoning of "adult establishment[s]," as defined by the Zoning Amendment. The principal provisions of the Zoning Amendment limit the permissible locations of adult establishments to non-residential districts[1] and require that they be located—within the districts in which they are permitted—at least 500 feet away from any school, day care center, or house of worship; at least 500 feet from excluded districts; and at least 500 feet from one another. Plaintiffs in these consolidated cases are patrons and owners of adult establishments within New York City who claim that the Zoning Amendment violates their rights to free expression under Article I, § 8 of the New York State Constitution and the First Amendment of the United States Constitution. In a case involving a different set of plaintiffs, we recently upheld the Zoning Amendment against facial federal constitutional challenges under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. *See Buzzetti*

---

1. Even prior to the passage of the Zoning Amendment, New York City's Zoning Resolution prohibited new commercial development in residentially zoned districts. Under the Zoning Amendment, adult establishments are also barred from certain districts that are zoned for commercial and manufacturing uses, but that permit new residential development as well.

*v. City of New York,* 140 F.3d 134 (2d Cir. 1998).

The factual background of the Zoning Amendment is detailed both in *Buzzetti* and in prior state and federal decisions arising from the instant litigation, with which we assume familiarity. *See Hickerson v. City of New York,* 997 F.Supp. 418 (S.D.N.Y.1998); *Hickerson v. City of New York,* 932 F.Supp. 550 (S.D.N.Y.1996); *Stringfellow's of New York, Ltd. v. City of New York,* 171 Misc.2d 376, 653 N.Y.S.2d 801 (N.Y.Sup.Ct.1996), *aff'd,* 241 A.D.2d 360, 663 N.Y.S.2d 812 (1st Dep't 1997), *aff'd,* 91 N.Y.2d 382, 671 N.Y.S.2d 406, 694 N.E.2d 407 (1998). The instant appeal is from an order of the United States District Court for the Southern District of New York (Miriam Goldman Cedarbaum, *Judge*), dated March 6, 1998, which denied plaintiffs' motion for a temporary restraining order and a preliminary injunction to stay the enforcement of the Zoning Amendment.[2] Although at the heart of this litigation is a controversy over free expression, plaintiffs have already presented their free-speech claims to the New York courts. The only question before us is whether the New York courts' rejection of plaintiffs' state constitutional claims forecloses plaintiffs from relitigating, in the form of a First Amendment claim in federal court, the same issues that were resolved against them in state court. We agree with the district court that the "full faith and credit" statute prevents a federal court from revisiting the same issues that were decided against plaintiffs by the New York state courts, which provided plaintiffs with a full and fair opportunity to litigate these issues. Accordingly, we affirm.

## I.

■ We review the district court's denial of a preliminary injunction for an abuse of discretion. *See Bery v. City of New York,* 97 F.3d 689, 693 (2d Cir.1996). "It is by this time black-letter law that the party seeking a preliminary injunction must establish that: (1) absent injunctive relief, it will suffer an irreparable injury; and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and the balance of hardships tips in favor of the movant." *Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.,* 143 F.3d 688, 696 (2d Cir.1998). "Violations of First Amendment rights are commonly considered irreparable injuries for the purposes of a preliminary injunction." *Bery,* 97 F.3d at 693. Because we conclude, however, that plaintiffs are collaterally estopped from relitigating the issues that govern their First Amendment claim, they can show neither "a likelihood of success on the merits" nor "sufficiently serious questions going to the merits to make them a fair ground for litigation."

■ Under the full faith and credit statute, 28 U.S.C. § 1738,[3] "Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so." *Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *see also Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 84, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984) (noting that § 1738 "embodies the view that it is more important to give full faith and credit to state-court judgments than to ensure separate forums for federal and state claims"); *see generally Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979) ("A fundamental precept of common-law adjudication, embod-

---

**2.** During the prior state-court proceedings, the enforcement of the Zoning Amendment was stayed by court order. The stay was terminated by Judge Cedarbaum's March 6, 1998 order denying plaintiffs' application for a preliminary injunction. Judge Cedarbaum stayed her order until March 11, 1998, to allow plaintiffs to seek a stay in this Court. Judge Walker extended the stay to March 11, 1998 so that the issue could be considered by a three-judge panel, and the panel ordered the appeal to be expedited and extended the stay through the hearing of the expedited appeal. At oral argument of this expedited appeal on April 29, 1998, we extended the stay until further order of this Court.

**3.** 28 U.S.C. § 1738 provides, in pertinent part, that state court determinations "shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken."

ied in the related doctrines of collateral estoppel and res judicata, is that a 'right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction ... cannot be disputed in a subsequent suit between the same parties or their privies ....'") (quoting *Southern Pacific R. Co. v. United States,* 168 U.S. 1, 48–49, 18 S.Ct. 18, 42 L.Ed. 355 (1897) (ellipses in original)). New York law provides that an issue may not be relitigated if the identical issue was necessarily decided in a previous proceeding, provided that the party against whom collateral estoppel is being asserted had a full and fair opportunity to litigate the issue in the prior action. *See, e.g., In re Sokol,* 113 F.3d 303, 306 (2d Cir. 1997); *Ryan v. New York Tel. Co.,* 62 N.Y.2d 494, 500–01, 478 N.Y.S.2d 823, 826–27, 467 N.E.2d 487, 490–91 (1984).

We agree with the district court that the issues decided and the standards applied by the New York state courts in rejecting plaintiffs' state constitutional challenge are the same that would be applicable to plaintiffs' First Amendment claim. Under both the federal and state Constitutions, the Zoning Amendment must: (1) be "content neutral," in the sense that it is aimed not at the restricted speech itself but at the negative secondary consequences that flow from it; (2) serve substantial government interests and be no broader than necessary to serve these interests; and (3) leave open reasonable alternative avenues of communication. *Compare City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 49–50, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), *with Stringfellow's of New York, Ltd. v. City of New York,* 91 N.Y.2d 382, 671 N.Y.S.2d 406, 694 N.E.2d 407 (1998). The New York Court of Appeals unanimously held that the Zoning Amendment met these standards—just as this Court in *Buzzetti* found the Zoning Amendment constitutionally unobjectionable on the record then before us—and this determination is equally dispositive of plaintiffs' claim under the First Amendment. *Cf. Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 479–80, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982) (holding, in Title VII case, that "[a]lthough the claims presented to the NYHRD [New York State Division of Human Rights] and

subsequently reviewed by the Appellate Division were necessarily based on New York law, the alleged discriminatory acts are prohibited by both federal and state laws. The elements of a successful employment discrimination claim are virtually identical; petitioner could not succeed on a Title VII claim consistently with the judgment of the NYHRD that there is no reason to believe he was terminated or not rehired because of age or religion. The Appellate Division's affirmance of the NYHRD's dismissal necessarily decided that petitioner's claim under New York law was meritless, and thus it also decided that a Title VII claim arising from the same events would be equally meritless." (footnotes omitted)).

Plaintiffs do not deny that the state and federal standards are nominally the same in all material respects, but rather argue that the standards are applied differently in state and federal court. In particular, plaintiffs contend that federal courts require greater proof from municipalities that the non-speech-related government interests at stake are substantial and that reasonable alternative avenues of communication remain available. We note that this contention is in stark contrast to plaintiffs' repeated assertions in earlier stages of this litigation that New York courts apply more favorable standards to their free-speech claims than federal courts. In any event, apart from their recent vintage, plaintiffs' arguments are mistaken.

### A. Substantial Government Interests

With respect to the substantiality of New York's non-speech-related interests in the Zoning Amendment, the New York Court of Appeals observed that "the City Council assembled an extensive legislative record connecting adult establishments and negative secondary effects, including numerous studies on the effects of adult establishments both within and without New York City." *Stringfellow's,* 91 N.Y.2d at 397, 671 N.Y.S.2d 406, 694 N.E.2d 407. The court then reviewed in detail this legislative record, which included studies by the Times Square Business Improvement District, the Chelsea Action Coalition and Manhattan Community

Board 4, and the Department of City Planning ("DCP"). Each of these studies linked the presence of adult establishments to increased crime and decreased property values. *See id.* at *6–7, 671 N.Y.S.2d 406, 694 N.E.2d 407.[4] The court also noted that, apart from the City's own studies, the legislative record contained the conclusions of studies conducted by city councils and town boards throughout the country, which also showed a correlation between adult establishments and negative secondary effects such as increased crime, depressed real estate markets, and an overall decline in the quality and character of surrounding neighborhoods. *See id.* Finally, the court rejected plaintiffs' complaints about the sufficiency of the evidence, holding that it was entirely appropriate to rely on studies from other jurisdictions—particularly in light of the fact that City officials had considered the comparability and reliability of these studies—and that the "nonempirical" nature of some of the City's evidence (*i.e.,* from surveys of businesses and real-estate brokers) did not render it valueless or insubstantial. *See id.* at *8, 671 N.Y.S.2d 406, 694 N.E.2d 407.

Plaintiffs now raise the same objections to the City's evidence that were rejected by the New York Court of Appeals, and despite that court's thorough review and analysis of the legislative record, plaintiffs claim that federal law requires the City to provide greater evidence of negative secondary effects than the New York courts required. Accordingly, plaintiffs contend that they are not estopped from relitigating the sufficiency of the City's evidence under this allegedly more stringent federal standard. In arguing that a more stringent standard exists, plaintiffs rely almost exclusively on *Phillips v. Borough of Keyport,* 107 F.3d 164 (3d Cir.1997) (en banc), a case that provides no support whatsoever for their position. *Phillips* was an adult-use zoning case in which the Third Circuit required additional evidentiary sup-

port for a zoning ordinance that had been upheld by the district court "(1) without an answer from the defendants identifying the secondary effects alleged to justify the burden on expression, and (2) without a record supporting the reasonableness of any legislative expectations regarding the likelihood of these secondary effects and the ameliorative effect of the ordinance." *Id.* at 173. The Third Circuit noted that, whereas in *Renton* the Supreme Court had considered the City of Renton's legislative record to be adequate where it consisted solely of studies from other cities that could reasonably be deemed relevant, "[h]ere, the district court had no way of knowing what problem or problems the Borough thought it was facing and there is no study or other evidence in the record concerning the secondary effects of 'adult entertainment uses.'" *Id.* at 174. In order to avoid "reduc[ing] the First Amendment to a charade in this area," *id.* at 175, the Third Circuit required the Borough at least to "identify" the secondary effects with some particularity, and to "offer some record support for the existence of those effects," *id.* Far from suggesting that federal law would require more exacting scrutiny of the legislative record than was undertaken by the New York courts in this case, *Phillips* stands for nothing more than the unremarkable proposition that a barren legislative record will not suffice under the First Amendment—a proposition which is unhelpful to plaintiffs, in light of the fact that the legislative record in the present case is quite extensive, as the state courts recognized.

In any event, quite apart from the fact that we find no merit in plaintiffs' argument that the federal standard for judging the substantiality of New York's non-speech-related interests is stricter than the state standard, this Court, in *Buzzetti,* has already considered and rejected the argument that the legislative record is inadequate, as a matter

---

**4.** Although plaintiffs argue on appeal that the DCP's own study suggests no correlation between adult establishments and the negative secondary effects identified by the City, the New York Court of Appeals took account of, and rejected, this very argument, observing that "[a]lthough the DCP acknowledged that its analysis of the hard data regarding the relationship between

adult uses and urban ills did not yield conclusive results, a reading of its report as a whole indicates that the negative perception of adult enterprises held by the business community and the public itself results in disinvestment, with the concomitant deterioration in the social and economic well-being of the surrounding area." *Id.* at *7.

of federal law, to support the City's legitimate and substantial interests in the Zoning Amendment. As we stated in *Buzzetti:*

> *Renton* emphasized that city officials were not required to make particular findings regarding the secondary effects of adult entertainment in Renton itself, but rather were "entitled to rely on the experiences of ... other cities." *Renton,* 475 U.S. at 51, 106 S.Ct. at 931; *see id.* at 51–52, 106 S.Ct. at 931 ("The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses."). Thus, New York City's reliance on studies from a variety of other areas of the country was well-placed. But ... New York City went beyond this minimal requirement: the DCP conducted its own detailed study, consulted other studies conducted in particular neighborhoods of New York City, and considered testimony given at public hearings in New York.

140 F.3d at 140 (first ellipsis in original). Accordingly, it is clear that there is no basis for allowing plaintiffs to relitigate this issue in federal court.

B. *Alternative Avenues of Communication*

Plaintiffs' argument that federal courts apply a more stringent standard than the New York courts applied to determine whether there are "reasonable alternative avenues of communication" is also unavailing. Indeed, the New York Court of Appeals summarized the standard that federal courts have applied, and proceeded to apply that very standard as the basis for its inquiry under the state Constitution. The court's discussion merits quotation at length:

> Relying on a formula derived from *City of Renton v. Playtime Theatres...,* the federal courts have generally concluded that reasonable alternative avenues of communication exist if there is sufficient land area open for use by adult businesses "in all stages of development from raw land to developed, industrial, warehouse, office and shopping space that is criss-

crossed by freeways, highways and roads" (*id.,* at 53–54, 106 S.Ct. 925). Under *Renton,* land that is already occupied by commercial and manufacturing facilities and undeveloped land that is not for sale or lease is not to be automatically deemed unavailable. Further, any reduction in profitability caused by a forced relocation is not relevant to the availability inquiry (*see, City of Renton v. Playtime Theatres,* [475 U.S.] at 53, 106 S.Ct. 925; *Woodall v. City of El Paso,* 49 F.3d 1120, 1124–25 [ (5th Cir.) ], *cert* [.] *denied* [,] 516 U.S. 988, 116 S.Ct. 516, 133 L.Ed.2d 425 [ (1995) ]; *Grand Brittain, Inc. v. City of Amarillo, Tex.,* 27 F.3d 1068, 1070 [ (5th Cir.1994) ]; *see also, Town of Islip v. Caviglia,* [73 N.Y.2d 544,] 555, 560, 542 N.Y.S.2d 139, 540 N.E.2d 215 [ (1989) ] (areas of a municipality set aside for adult uses need not be prime locations)). Rather, the inquiry is limited to the *physical* and *legal* availability of alternative sites within the municipality's borders and whether those sites are part of an actual business real estate market (*see, Topanga Press, Inc. v. City of Los Angeles,* 989 F.2d 1524, 1530–31 [ (9th Cir. 1993) ], *cert* [.] *denied* [,] 511 U.S. 1030, 114 S.Ct. 1537, 128 L.Ed.2d 190 [ (1994) ]; *see also, Woodall v. City of El Paso, supra; Alexander v. City of Minneapolis,* 928 F.2d 278 [ (8th Cir.1991) ].)

> In determining whether proposed relocation sites are part of an actual business real estate market, the courts have considered such factors as their accessibility to the general public, the surrounding infrastructure, the pragmatic likelihood of their ever actually becoming available and, finally, whether the sites are suitable for "some generic commercial enterprise" (*see* [*Topanga*], 989 F.2d at 1531). Notably, these considerations dovetail nicely with *Islip*'s requirement that there be "ample space available for adult uses after the rezoning" and no showing of a substantial reduction in the total number of adult outlets or the accessibility of those outlets to their potential patrons (73 N.Y.2d at 555, 560, 542 N.Y.S.2d 139, 540 N.E.2d 215). With these considerations as a backdrop, we

turn now to the specific facts and contentions presented here.

*Stringfellow's,* 91 N.Y.2d at ——, 671 N.Y.S.2d 406, 694 N.E.2d 407, 1998 WL 77749, at *9–10.

Significantly, the two cases most heavily relied upon by plaintiffs in arguing that federal law imposes more of an evidentiary burden on the City to prove the availability and suitability of alternative sites than the New York state courts imposed—*Topanga Press, Inc. v. City of Los Angeles* and *Woodall v. City of El Paso*—were cited and relied upon by the New York Court of Appeals. Forced to acknowledge this fact, which strongly suggests that the state court was not answering a different question or applying a standard less favorable to plaintiffs than federal courts would apply, plaintiffs argue that while "the New York Court of Appeals did refer to the *Topanga* and *Woodall* decisions[, a]nd ... did suggest that the City was obligated to demonstrate 'the *physical* and *legal* availability of alternative sites .... and whether those sites are part of the actual business real estate market[,]' ... there is a serious analytic gap between this language ... and the factual record developed in the state trial court." Brief of Hickerson Appellants at 31–32. Plaintiffs argue, in other words, that while the New York Court of Appeals purported to be making the same determination that a federal court would make under federal law to determine the availability of "reasonable alternative avenues of communication," plaintiffs should not be collaterally estopped from relitigating this issue because the "serious analytic gap" between the evidence and the recited standard belies any conclusion that federal standards were genuinely applied.

We find no such "serious analytic gap," nor any reason to doubt that the New York Court of Appeals answered the same question that would be dispositive under federal law. Plaintiffs' primary argument to the contrary is that federal law requires municipalities to identify the *specific* physically and legally available relocation sites. Plaintiffs have produced an affidavit from a land-use planning consultant, Robert McLaughlin (the "McLaughlin Affidavit" or "Affidavit"), which

asserts that some of the land identified by the City as available for relocating adult establishments is not realistically available, for a variety of reasons—some of the land, for example, is allegedly occupied by "oil tank farms" and structures including "numerous and large facilities of the New York City Sanitation Department." McLaughlin Affidavit at 24, 26. Unless the City can precisely identify the "physically and legally available" sites to which the approximately 147 adult establishments that will need to relocate can move, plaintiffs argue, the City has not carried its burden of proving that "reasonable alternative avenues of communication" exist under federal law.

Plaintiffs' argument suffers from several flaws. First, we are aware of no federal case, and plaintiffs direct our attention to none, that requires municipalities to identify the exact locations to which adult establishments may relocate, as opposed to identifying the general areas that remain available and proving that such areas contain enough potential relocation sites that are "physically and legally available" to accommodate the adult establishments. This is precisely the standard of proof to which the New York Court of Appeals held the City. Clearly then, to second-guess that court's determination of this issue would violate the full faith and credit statute.

After observing that "it is incumbent upon the municipal defendants to demonstrate that sufficient alternative receptor sites are available," *Stringfellow's,* 91 N.Y.2d at ——, 671 N.Y.S.2d 406, 694 N.E.2d 407, 1998 WL 77749, at *10, the New York Court of Appeals noted the City's evidence that, after excluding land identified by the City as being encumbered by properties unlikely to be developed for commercial use, 4% of the total land area of the City remained open to adult establishments. Maps prepared by the City reflected that, after factoring in the Zoning Amendment's 500-foot buffer zones, over 500 potential sites remained available. *See id.* Further, the New York Court of Appeals considered the City's evidence that the zoning districts left open to adult establishments "permit a wide mix of commercial, retail, entertainment and manufacturing uses," *id.,*

and that all of these areas in Manhattan and 80% of the areas in the other boroughs of New York are within a ten-minute walk from a subway line or major bus route, *see id.*[5]

The court did not ignore plaintiffs' evidence—namely, the McLaughlin Affidavit—that portions of the 4% of "unencumbered" land identified by the City were not realistically available, but rather found this evidence insufficient to raise a material question of fact regarding the availability of "reasonable alternative avenues of communication." The court partially discredited the McLaughlin Affidavit because McLaughlin considered land to be "unavailable" that, under *Renton,* is not to be excluded—such as industrial areas, undeveloped land, and warehouse areas. *See Renton,* 475 U.S. at 53–54, 106 S.Ct. 925 (finding available land to be adequate where it included "acreage in all stages of development from raw land to developed, industrial, warehouse, office, and shopping space," and observing that the fact that the establishments "must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation"); *see also, e.g., Grand Brittain, Inc. v. City of Amarillo, Tex.,* 27 F.3d at 1069–70 (holding that adult-use zoning ordinance provided reasonable alternative avenues of communication even though 90% of prospective sites were on undeveloped land). The court also recognized that while the McLaughlin Affidavit identified, within the 4% of purportedly "unencumbered" land identified by the City, specific sites that were clearly not realistically available, this was insufficient to cast doubt upon the availability of "reasonable alternative avenues of communication" where the City had produced evidence showing that this land could accommodate over 500 establishments under the terms of the Zoning Amendment, approximately *three times* the number of establishments that currently exist:

> The most significant flaw in McLaughlin's affidavit ... is the absence of any attempt to quantify his observations or to make concrete allegations as to precisely how many of the 500 potential receptor sites identified by defendants were, in his estimate, unavailable.[6]  To be sure, the affidavit lists a significant number of sites that are pragmatically unavailable because their current uses are so entrenched that they are unlikely to become part of the commercial real estate market in the foreseeable future.  Included in this category are such diverse sites as those that house the northern half of Federal Plaza in Manhattan, the Clay Pit Ponds State Park Preserve in Staten Island, a New York City fire house in Brooklyn and a United Parcel Service facility in Queens.  However, McLaughlin's criticisms about various individual sites do not provide an adequate counter to defendants' supported claim that within the available acreage as a whole there are more than enough receptor sites to accommodate the existing adult entertainment industry.

*Stringfellow's,* 91 N.Y.2d at ——, 671 N.Y.S.2d 406, 694 N.E.2d 407, 1998 WL 77749, at *11; *see also Stringfellow's,* 171 Misc.2d at 396, 653 N.Y.S.2d at 814 ("Even if the City's estimate overstates the number of potentially viable relocation sites, there still remains ample space for more than the existing numbers of adult establishments.... [N]othing in *Renton, Islip* or any existing case law requires the City to identify specific

---

5. The accessibility of potential sites in the so-called "outer boroughs" disposes of plaintiffs' argument—which, in any event, is without foundation and unsupported by case law—that in contrast to the state courts' analysis, the First Amendment requires proof of adequate available sites on a borough-by-borough basis.

6. McLaughlin subsequently did quantify, in a new but substantially similar affidavit submitted to the district court, the number of sites he considered to be realistically available (90). However, in light of our agreement with the district court that plaintiffs had a full and fair opportunity to present evidence in state court, *see infra,* this belated submission does not affect our collateral estoppel inquiry. "A party ... cannot avoid issue preclusion simply by offering evidence in the second proceeding that could have been admitted, but was not, in the first." 18 James Wm. Moore, *et al., Moore's Federal Practice* § 132.02(2)(d), at 132–26 (3d ed.1998); *see, e.g., Yamaha Corp. v. United States,* 961 F.2d 245, 254–55, 257 (D.C.Cir.1992), *cert. denied,* 506 U.S. 1078, 113 S.Ct. 1044, 122 L.Ed.2d 353 (1993).

sites that are actually available."); *cf. Woodall v. City of El Paso*, 49 F.3d at 1126 (stating, in response to complaints by adult establishments as to the viability of particular sites, that "even if we agreed that ... these sites suffered from defects so severe as to take them out of the commercial real estate market and render them physically unavailable, there was no evidence that surrounding sites suffered from the same impediments so as to render them likewise unavailable").

In sum, there is no reason to doubt that the New York Court of Appeals applied the same standard and answered the same questions that apply under federal law in determining whether the Zoning Amendment provided for "reasonable alternative avenues of communication." The argument that federal law would have required the City to identify the precise sites to which adult establishments could relocate is not only unsupported by any federal case law, but is belied by our recent decision in *Buzzetti*. In *Buzzetti*, far from suggesting that the City's evidence was inadequate because it was not site-specific, we held that "there can be no doubt on this record that the Zoning Amendment allows for reasonable alternative avenues of communication." 140 F.3d at 140 (internal quotation marks omitted). Although we did not have the McLaughlin Affidavit before us in *Buzzetti*, the McLaughlin Affidavit is only relevant to whether plaintiffs have produced enough counter-evidence to cast doubt on the City's evidence, and it does not change the fact that under federal law the City was not required to identify precise relocation sites in order to prove the existence of "reasonable alternative avenues of communication." The state courts' determination that the McLaughlin Affidavit did not cast sufficient doubt on the City's evidence to preclude summary judgment—based largely on the Affidavit's failure to quantify the number of feasible sites, its reliance on premises that were invalid under *Renton*, and the persuasiveness of the City's own evidence—does not, in short, represent a departure from federal standards. The full faith and credit statute therefore bars plaintiffs from relitigating the issue of alternative sites in federal court.

### C. *Plaintiffs' Opportunity to Litigate the Issues in State Court*

Collateral estoppel will only apply if plaintiffs had a "full and fair opportunity" in New York state court to litigate the issues that they now seek to relitigate in federal court. *See In re Sokol*, 113 F.3d at 306; *Ryan*, 62 N.Y.2d at 501, 478 N.Y.S.2d at 826, 467 N.E.2d at 490. Plaintiffs, as the parties opposing the application of collateral estoppel, bear the burden of proving that they were denied this full and fair opportunity. *See In re Sokol*, 113 F.3d at 306; *Kaufman v. Eli Lilly & Co.*, 65 N.Y.2d 449, 456, 492 N.Y.S.2d 584, 588, 482 N.E.2d 63, 67 (1985). Under New York law, "[a] determination whether the first action or proceeding genuinely provided a full and fair opportunity requires consideration of the realities of the [prior] litigation, including the context and other circumstances which ... may have had the practical effect of discouraging or deterring a party from fully litigating the determination which is now asserted against him." *Ryan*, 62 N.Y.2d at 501, 478 N.Y.S.2d at 827, 467 N.E.2d at 491 (internal quotation marks and citation omitted; alterations in original). Included among the factors to be considered are "the nature of the forum and the importance of the claim in the prior litigation, the incentive and initiative to litigate and the actual extent of litigation, [and] the competence and expertise of counsel." *Id.* Substantially for the reasons stated by Judge Cedarbaum, we believe that plaintiffs have not met their burden of proving that they were denied a full and fair opportunity to litigate their claims in state court. *See Hickerson*, 997 F.Supp. at 423–24.

Accordingly, because the same issues decided by the state courts are dispositive of plaintiffs' claims under the First Amendment, and because plaintiffs had a full and fair opportunity to litigate these issues in state court, they are collaterally estopped from relitigating them in federal court.

### II.

Plaintiffs argue that they are not precluded from litigating their First Amend-

ment claim in federal court because they informed the state court, pursuant to *England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964), that they intended to reserve the right to litigate their federal claims in federal court. *England* held that, after a federal court has abstained under the doctrine of *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), in order to obtain an authoritative interpretation of state law that could potentially moot or influence the federal constitutional questions presented, parties who have been remitted to state court against their will are not forced to litigate their federal claims there, but may reserve the right to a federal adjudication of these claims. *See* 375 U.S. at 421–22, 84 S.Ct. 461. The Supreme Court in *England* stated its "fundamental objections to any conclusion that *a litigant who has properly invoked the jurisdiction* of a Federal District Court to consider federal constitutional claims can be *compelled, without his consent and through no fault of his own*, to accept instead a state court's determination of those claims." *Id.* at 415, 84 S.Ct. 461 (emphasis added).

Consistent with *England*'s focus on the problem of depriving a litigant who has "invoked" the jurisdiction of a federal court from being deprived of that choice "without his consent and through no fault of his own," the Supreme Court appeared to suggest in a subsequent case that an *England* reservation would only be available when the federal courts were a litigant's initial forum of choice. *See Allen v. McCurry*, 449 U.S. 90, 101 n. 17, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980) (characterizing *England* as applying "[w]here a plaintiff properly *invokes federal-court jurisdiction in the first instance* on a federal claim" (emphasis added)). A similar suggestion was made in *Migra v. Warren City School District Board of Education*, 465 U.S. 75, 84–85 & n. 7, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). The question in *Migra* was whether litigants who could have, but did not, raise certain claims in their state case were precluded from raising those claims in a subsequent § 1983 suit in federal court. The Court held that such litigants were indeed so precluded, and relied heavily on the fact that

such litigants voluntarily chose to proceed initially in state court. The petitioner in *Migra*, the Court observed, did "not claim that the state court would not have adjudicated her federal claims had she presented them in her original suit in state court. Alternatively, petitioner could have obtained a federal forum for her federal claim by litigating it first in a federal court." *Id.* at 84–85, 104 S.Ct. 892. Having emphasized the voluntariness of the decision to file suit initially in state court, the Court then carefully noted that *England* provides a way for plaintiffs to return to federal court after a district court has abstained. *See id.* at 85 n. 7, 104 S.Ct. 892. By contrasting *England* with the situation in which a plaintiff has chosen to file suit in state court even though he could have sought an adjudication of his federal constitutional claims in federal court, *Migra* can be read to suggest that *England* was not aimed at litigants who initially brought suit in state court. *Cf. Fields v. Sarasota Manatee Airport Auth.*, 953 F.2d 1299, 1306 (11th Cir. 1992) ("The *Migra* Court made clear that *England* could apply when a litigant with a federal constitutional claim is *involuntarily* in state court." (emphasis added)).

In the instant case, plaintiffs did not invoke the jurisdiction of the federal court in the first instance, only to have the court invoke *Pullman* abstention. Instead, they filed suit in state court, which they believed would look upon their free-speech claims more favorably. Moreover, after defendants removed the case to federal court, plaintiffs moved to remand the case in its entirety (including their First Amendment claim) to state court, arguing that the case was not properly removable and also vigorously urging that their state constitutional claims "predominate[d]," while their First Amendment claim was a mere "adjunct" or "supplement." *See* Affirmation on Behalf of Amsterdam Video Plaintiffs, in Support of Motion to Remand, dated April 26, 1996 (United States District Court for the Southern District of New York, No. 96 Civ. 2204), in Joint Appendix at 227. The district court, in response to plaintiffs' motion, abstained under *Pullman* and remitted the state claims to state court, but denied plain-

tiffs' request to remand the federal constitutional claims and instead stayed these claims pending the outcome of the state litigation. *See* 932 F.Supp. at 551. Only then did plaintiffs file an *England* reservation.

█ Under these circumstances, plaintiffs cannot meaningfully be said to have been deprived of a federal forum for their federal claims "without [their] consent and through no fault of [their] own." *England*, 375 U.S. at 415, 84 S.Ct. 461. If *defendants* had not sought to avail themselves of a federal forum after plaintiffs filed suit in state court, plaintiffs would have been held to their choice of forum and would have been required to submit their First Amendment claim to the New York state courts. The same would have been true if plaintiffs had been successful in moving to remand the entire case to state court. Alternatively, if plaintiffs' priority had been to obtain a federal forum for their First Amendment claim, they could have filed suit in federal court initially. *Cf. Migra*, 465 U.S. at 84–85 & n. 7, 104 S.Ct. 892. In light of *England*'s emphasis on the need to preserve access to a federal forum *for those litigants who have chosen it*, and in light of the suggestive characterizations of *England* by the Supreme Court in the later cases of *Allen v. McCurry* and *Migra*, we agree with those courts that have held that *England* applies only to litigants who have sought to proceed in federal court in the first instance, and not to litigants such as the instant plaintiffs who voluntarily chose to file suit in state court. *See Peduto v. City of North Wildwood*, 878 F.2d 725, 729 n. 5 (3d Cir.1989) ("[A]s plaintiffs here invoked the jurisdiction of the state court in the first instance, the application of *England* has no relevance here."); *Schuster v. Martin*, 861 F.2d 1369, 1373–74 (5th Cir.1988) (*England* "does not apply where the plaintiff voluntarily chooses to pursue a state action first."); *Fuller Co. v. Ramon I. Gil, Inc.*, 782 F.2d 306, 312 (1st Cir.1986) ("In order to make an *England* reservation, a litigant must establish its right to have its federal claims adjudicated in a federal forum by properly invoking the jurisdiction of the federal court in the first instance."); *cf. Fields v. Sarasota Manatee Airport Auth.*, 953 F.2d at 1304–05 (considering itself bound by predecessor-cir-

cuit decision, *Jennings v. Caddo Parish Sch. Bd.*, 531 F.2d 1331, 1332 (5th Cir.), *cert. denied*, 429 U.S. 897, 97 S.Ct. 260, 50 L.Ed.2d 180 (1976), allowing plaintiffs to file *England* reservation prior to bringing suit in federal court, but noting that "*Jennings* effectively abolishes the first requirement for an *England* reservation—filing in the first instance in federal court. Thus, it appears that the *Jennings* panel misread *England*, effectively rewriting the requirements for a valid *England* reservation."); *see generally* 17A Charles Allan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 4243, at 6 (1998 Pocket Part) ("The *England* procedure strictly speaking is applicable only if a case was begun in federal court.").

We are not persuaded that a contrary result is required by footnote 13 of *England*, which contains some broad language seized upon by plaintiffs, but which we read simply to indicate that an *England* reservation is available not only to plaintiffs, but also to defendants who have removed the case to federal court, only to have the district court abstain. Footnote 13 states:

> The reservation may be made by any party to the litigation. Usually the plaintiff will have made the original choice to litigate in the federal court, but the defendant also, by virtue of the removal jurisdiction, 28 U.S.C. § 1441(b), has a right to litigate the federal question there. Once issue has been joined in the federal court, no party is entitled to insist, over another's objection, upon a binding state court determination of the federal question. Thus, while a plaintiff who unreservedly litigates his federal claims in the state courts may thereby elect to forgo his own right to return to the District Court, he cannot impair the corresponding right of the defendant. The latter may protect his right by either declining to oppose the plaintiff's federal claim in the state court or opposing it with the appropriate reservation.

*England*, 375 U.S. at 422 n. 13, 84 S.Ct. 461. Despite plaintiffs' reliance on the statement that "[o]nce issue has been joined in the federal court, no party is entitled to insist, over another's objection, upon a binding state court determination of the federal question,"

we believe that it is clear, in context, that this footnote was only intended to clarify that *England* applies to defendants as well as plaintiffs, and that the particular language relied upon by plaintiffs was intended simply to clarify that a plaintiff may not, by fully litigating his federal claims in state court, deprive a defendant of his right to return to the federal forum. We do not read this language to render irrelevant a plaintiff's choice to avail himself of state, rather than federal, jurisdiction in the first instance, and we believe such a reading would contravene *England*'s emphasis on preserving the federal forum for those who have "invoked" it but have been deprived of it "through no fault of [their] own." *Id.* at 415, 84 S.Ct. 461. Plaintiffs not only voluntarily filed suit in state court, but sought to remand the entire case to state court after it had been removed to federal court by defendants; while footnote 13 of *England,* under these circumstances, would have protected *defendants* from being deprived of their choice of a federal forum, it does not allow defendants' choice of a federal forum to be preserved by *plaintiffs.*

### III.

■ Apart from their reliance on *England,* plaintiffs raise several other arguments as to why collateral estoppel does not apply, each of which is without merit. First, citing *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), plaintiffs argue that because their federal claim arises under the First Amendment, they are entitled to an independent examination of the record. In First Amendment cases, notwithstanding the "clearly erroneous" standard of factual review set forth in Fed.R.Civ.P. 52(a), "we are required to make an independent examination of the record as a whole without deference to the factual findings of the trial court." *Bery,* 97 F.3d at 693 (citing, *inter alia, Bose Corp.,* 466 U.S. at 499, 104 S.Ct. 1949). However, this rule only concerns the proper level of *appellate* review, and does not bar the application of collateral estoppel. *See Ferris v. Cuevas,* 118 F.3d 122, 125 n. 3 (2d Cir.1997) (citing *Bose* requirement, but noting, pursuant to finding plaintiffs' First Amendment claims that were not raised in prior state-court proceedings to be barred by *res judicata,* that "[b]ecause our holding to-

day is procedurally based and does not reach the merits … we do not conduct this higher level of factual review.").

■ Plaintiffs also rely on the doctrine that "changes in facts essential to a judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues." *Montana,* 440 U.S. at 159, 99 S.Ct. 970. They argue that such a change occurred when Mayor Rudolph W. Giuliani, one of the defendants in this action, stated at a press conference following the New York Court of Appeals' decision that the Zoning Amendment would "severely limit[ ]" the places adult establishments could relocate to, and would "reduce the number in the city to something like 20 or 30." Text of Mayor Giuliani's City Hall Press Conference, February 24, 1998, in Joint Appendix at 914. *Montana* makes clear that the exception to collateral estoppel based on intervening changes in the factual record applies only when these changes "significant[ly]" affect the overall complexion of the record. *See* 440 U.S. at 157, 99 S.Ct. 970; 18 James Wm. Moore, *et al., Moore's Federal Practice* § 132.02(2)(e), at 132–27 to –28 (3d ed.1998) (in order to render issue preclusion inapplicable, "a difference in pertinent facts" must be "sufficient to substantially change the issue"). Mayor Giuliani's statements to the press, particularly when compared to the extensive legislative record compiled by the City— whose conclusions actually differ from those stated at Mayor Giuliani's press conference— simply do not meet that standard.

A final point that, in plaintiffs' view, counsels against the application of collateral estoppel, is that Supreme Court review is unavailable with respect to the New York state courts' determination of a question of state law. This argument fails to appreciate that the district court made a determination of federal law—namely, that the issues decided and the standards applied by the New York courts are the same as those that would be dispositive under the First Amendment. If the district court's interpretation of the governing First Amendment standards were mistaken, and if this Court were mistaken in affirming the district court's interpretation of federal law, the Supreme Court would remain free to so find and to order this case to proceed in district court.

## IV.

In sum, under the full faith and credit statute and New York's law of collateral estoppel, plaintiffs may not relitigate their First Amendment claim in federal court because the same issues that are dispositive of this claim have already been decided in state court. Plaintiffs had a full and fair opportunity to litigate these issues in state court, and they raise no valid ground for barring the application of the doctrine of collateral estoppel. Accordingly, plaintiffs can show neither "a likelihood of success on the merits" nor "sufficiently serious questions going to the merits to make them a fair ground for litigation," and the district court's denial of plaintiffs' motion for a preliminary injunction was entirely proper. We have considered all of plaintiffs' other arguments, and find them to be without merit. The stay of Judge Cedarbaum's March 6, 1998 order is hereby vacated, the judgment of the district court is affirmed, and the Zoning Amendment may be enforced forthwith.