08-2789-cv
TJS of New York, Inc. v. Town of Smithtown

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

—————————————————————————

August Term, 2008

(Argued:     June 4, 2009                                        Decided:     March 10, 2010)

Docket No. 08-2789-cv

—————————————————————————

TJS OF NEW YORK, INC., a New York Corporation,

*Plaintiff-Appellant*,

– v. –

TOWN OF SMITHTOWN, a New York Municipal Corporation,

*Defendant-Appellee.*

—————————————————————————

Before: WINTER, CALABRESI, and SACK, *Circuit Judges*.

—————————————————————————

Appeal from a judgment of the United States District Court for the Eastern District of New York (Feuerstein, *J.*), denying Plaintiff-Appellant's request for a declaratory judgment and permanent injunction barring enforcement of Defendant-Appellant's zoning ordinance. Plaintiff-Appellant argued that the ordinance failed to preserve adequate alternative sites for adult entertainment uses. The District Court evaluated the constitutionality of the ordinance according to the adequacy of alternative sites available at the time the ordinance was enacted. While we find no flaw in the legal standards employed by the District Court to assess whether alternative sites are available, we hold that when evaluating First Amendment challenges to a zoning ordinance, a court must consider the adequacy of alternatives at the time the ordinance is challenged. We therefore VACATE the District Court's decision and REMAND for further proceedings.

———————————————

RICHARD L. WILSON (Howard E. Greenberg, *on the brief*) Smithtown, N.Y., *for Plaintiff-Appellant*.

KENNETH M. SEIDELL, Smithtown, N.Y., *for Defendant-Appellee.*

_____

CALABRESI, *Circuit Judge*:

This case requires us to resolve an interesting and surprisingly unanswered question of First Amendment law: whether the constitutionality of a zoning ordinance should only be evaluated with regard to the "alternative avenues of communication" it leaves open at the time it is *passed*, or also those it leaves open at the time it is *challenged*. Plaintiff-Appellant TJS of New York, Inc. ("TJS") brought a First Amendment challenge to a zoning ordinance enacted by Defendant-Appellee Town of Smithtown, seeking an injunction and declaratory judgment to the effect that the ordinance did not give TJS adequate alternative sites on which to locate its adult entertainment business. The United States District Court for the Eastern District of New York (Feuerstein, *J.*) denied the request for declaratory judgment and a permanent injunction, upholding the ordinance on the ground that adequate alternative sites existed at the time the ordinance was passed. *See TJS of New York, Inc. v. Town of Smithtown*, No. 03-CV-4407, 2008 WL 2079044 (E.D.N.Y. May 13, 2008) ("*TJS*"). We hold that the First Amendment requires courts to consider the adequacy of alternative sites available when the ordinance is *challenged*. We therefore vacate and remand for further proceedings. We reject, however, TJS's argument that the District Court applied legally erroneous standards in determining whether a site was available for adult entertainment establishments, and we emphasize that nothing in our decision

alters the fact that municipalities have broad constitutional power to limit adult entertainment uses.

**I. Facts**

In 1994, Smithtown enacted a zoning ordinance limiting any new "adult entertainment" uses[1] to three kinds of zoning districts: shopping center business ("SCB"), light industry ("LI") and heavy industrial ("HI"). The same ordinance created an amortization schedule providing that any existing adult entertainment uses located in zones other than SCB, LI, and HI would become nonconforming uses after January 1, 1998. In addition to these general zoning restrictions, the ordinance also required that adult entertainment uses be located at least 500 feet from each other and from any "residence district, park, playground, school, church or similar place of public assembly." Chapter 322-30.2.

490 West Jericho Turnpike in Smithtown has been in use as an adult entertainment site since 1979, under various owners. It is located less than 500 feet from three different parks, and it is also located in a neighborhood business ("NB") zone. Accordingly, it became a nonconforming use under the 1994 ordinance.

At the time the ordinance was passed, the adult entertainment site at 490 West Jericho Turnpike was owned by 490 Habitat, Inc. ("Habitat"). In July 1999, Habitat filed a lawsuit

---

[1] Chapter 322-3 of the Town's zoning code identifies "adult entertainment" as:

> A public or private establishment which presents topless dancers, strippers, male or female impersonators, exotic dancers or other similar entertainments and which establishment is customarily not open to the public generally and excludes any minor by reason of age. This includes adult massage parlors, peep shows and adult theaters and similar types of businesses.

challenging the Town's zoning ordinance, arguing, *inter alia*, that the ordinance violated the First Amendment because it did not provide a reasonable number of locations for new adult entertainment businesses to open and operate in Smithtown. As the case proceeded to trial, the District Court ordered the Town to compile a list of alternative locations at which an adult entertainment use could to be located. The Town did so, coming up with 35 sites.

On May 30, 2000, while Habitat's challenge was pending, Smithtown amended the relevant code by requiring the 500-foot minimum spacing to be measured building-to-building rather than property line-to-property line, and by removing a special exception requirement that Habitat had argued was an unconstitutional prior restraint. Soon afterward, Habitat and the Town ended their litigation pursuant to a stipulation in which Habitat agreed to make a "diligent good faith effort" to relocate, but was permitted to continue operating at 490 West Jericho Turnpike until September 1, 2003.

In 2002, however, Habitat sold the site to TJS, which used it as an adult entertainment establishment called "The Oasis." In June 2003, the Town moved for an order of closure, and TJS responded by seeking a declaratory judgment and permanent injunction against enforcement of the ordinance. The case proceeded to a six-day bench trial before Judge Feuerstein in the United States District Court for the Eastern District of New York. At trial, experts testified for both the Town and TJS as to whether the ordinance preserved adequate alternative locations for adult entertainment uses, as required by the First Amendment.

In addition to disputing whether certain sites were in fact "available," the parties disagreed strongly about what time period was relevant to the inquiry. The Town argued that the only relevant question was whether adequate alternative locations existed at the time the

-4-

ordinance was passed. TJS, however, argued that the constitutionality of the ordinance should be evaluated with regard to the adequacy of alternative sites available at the time the complaint was filed.[2] The District Court concluded that TJS was "incorrect. It is a municipality's burden to pass a constitutional ordinance which, in order to be constitutional, must provide sufficient alternative avenues of expression *on the date of enactment*." *TJS*, 2008 WL 2079044, at *6 (emphasis added). The court then proceeded to evaluate the sites available on that date, found them to be adequate,[3] and denied TJS's request for a declaratory judgment and permanent injunction. *Id.* at *20. TJS timely appealed.

## II. Adult Entertainment, Zoning, and the First Amendment

Over the past few decades, adult entertainment establishments have played a disproportionately prominent role in First Amendment doctrine. Adult entertainment, unlike obscenity, *see generally Roth v. United States*, 354 U.S. 476 (1957), has been held by the Supreme Court to be protected by the First Amendment. And yet the High Court has often

---

[2] The Town notes that TJS stated before the District Court that "there is only one issue in this case and that is *on the day you enter judgment* are there sufficient alternative sites for TJS to locate." **[T 122]** (emphasis added). The Town argues that TJS should not now be permitted to disregard that argument in favor of a time-of-the-complaint analysis. We are not convinced that the two are inconsistent. Under either phrasing, the proposed test is simply whether the law *is* violating TJS's rights. Thus if the Town were to revise the ordinance between the date the complaint was filed and the date judgment is entered—as it did during the Habitat litigation—then the case might very well become moot. Similarly, if—as is true here—a case is remanded after a successful appeal and significant time has passed since the complaint was initially filed, the court must determine whether the law violates the First Amendment rights of the plaintiff at the time of the renewed proceeding. *See infra* page **[8-9]** (explaining that the court must evaluate adequacy as close to the time of judgment as is practicable).

[3] The District Court actually found that sufficient sites were available both in 1994, when the ordinance was adopted, *and* in 1999, when the earlier dispute was settled. 2008 WL 207044, at *20.

treated adult entertainment establishments and the activities they support as different from "core" First Amendment speech. Most notably, the Court has upheld adult entertainment zoning restrictions that would almost certainly be unconstitutional if applied to pure political speech. *See* Stone et al., *The First Amendment* 243 (3d ed. 2008) ("Presumably, the Court would not uphold a law restricting the location of theaters that show racist or anti-war films.").

The differential treatment of adult entertainment establishments goes back at least as far as *Young v. American Mini Theatres, Inc*., 427 U.S. 50 (1976), in which the Supreme Court upheld zoning ordinances providing that adult theaters could not be located within 1,000 feet of any two other "regulated uses," nor within 500 feet of a residential area. The Court concluded that "[t]he city's interest in planning and regulating the use of property for commercial purposes is clearly adequate to support that kind of [minimum spacing] restriction applicable to all theaters within the city limits." *Id.* at 62-63. The Court therefore held that "apart from the fact that the ordinances treat adult theaters differently from other theaters and the fact that the classification is predicated on the content of material shown in the respective theaters, the regulation of the place where such films may be exhibited does not offend the First Amendment." *Id.* at 63.

A decade later, in a case whose resolution the Court said was "largely dictated by" *Young*, the Court held that the First Amendment permits municipal governments to use zoning laws as a means of addressing the "secondary effects" of adult establishments. *City of Renton v. Playtime Theatres, Inc*., 475 U.S. 41, 46, 47–48 (1986). Under *Renton*, local governments may limit the location of adult entertainment establishments in order "to prevent crime, protect the city's retail trade, maintain property values, and generally protect and preserve the quality of the city's neighborhoods, commercial districts, and the quality of urban life, [but] not to suppress the

expression of unpopular views." *Id.* at 48 (alterations and internal quotation marks omitted). Thus, if a zoning ordinance serves "a substantial governmental interest *and allows for reasonable alternative avenues of communication*," the First Amendment is satisfied. *Id.* at 50 (emphasis added). It is the latter prong of this test with which we are concerned here.

The over-arching legal question in the present case, as in many First Amendment zoning challenges, is whether the challenged zoning ordinance preserves "reasonable alternative avenues of communication" for adult-oriented businesses. *See Buzzetti v. City of New York*, 140 F.3d 134, 140-41 (2d Cir. 1998) (citing *Renton*, 475 U.S. at 53-54). In the context of adult entertainment cases, we have held that the reasonableness inquiry requires an assessment of available other locations, *Hickerson v. City of New York*, 146 F.3d 99, 107-08 (2d Cir. 1998), and whether these alternatives afford a reasonable opportunity to locate and operate such a business, *Buzzetti*, 140 F.3d at 140-41. *See also Isbell v. City of San Diego*, 258 F.3d 1108, 1112 (9th Cir. 2001) ("To decide whether constitutionally sufficient alternatives exist, [a court should] first . . . determine how many sites are available and then determine whether that number is sufficient to afford adult establishments a reasonable opportunity to locate." (internal citations omitted)).[4] In approaching these inquiries, we look also to the time, place, and manner cases, from which the adult zoning cases descend, and to which they bear a strong family resemblance. *See Young*, 427 U.S. at 63 & n.18 (holding that regulating the location of adult films does not violate the First

---

[4] This does not mean that a municipality must identify the exact locations to which adult establishments may locate, "as opposed to identifying the general areas that remain available and proving that such areas contain enough potential relocation sites that are physically and legally available to accommodate the adult establishments." *Hickerson*, 146 F.3d at 107 (internal quotation marks omitted).

Amendment, and citing as support the proposition that "[r]easonable regulations of the time, place, and manner of protected speech, where those regulations are necessary to further significant governmental interests, are permitted by the First Amendment"). Although the two inquiries are not equivalent—most importantly, it is by no means clear whether or how the content-neutrality requirement that is central in time, place, and manner cases applies in adult entertainment zoning cases[5]—there are important similarities. This is so because, as with time, place, and manner restrictions, the underlying question in adult zoning cases is whether the challenged restriction leaves open adequate alternative avenues of communication.

**III. The Proper Time-Frame for Evaluating Adequacy**

---

[5] The Court's assertion of the time, place, and manner test in *Young* notably omitted that test's traditional content-neutrality requirement. *See, e.g.*, *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984) (holding that "content-neutral" time, place, and manner regulations are acceptable so long as they are narrowly tailored to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication). Even if such a requirement applies to zoning ordinances that target adult uses, determining whether such ordinances are in fact content-neutral is a tricky question. Writing for the majority in *Renton*, Chief Justice Rehnquist concluded that because "the Renton ordinance is aimed not at the *content* of the films . . . , but rather at the *secondary effects* of such theaters on the surrounding community," it was as "completely consistent with our definition of content-neutral speech regulations as those that are *justified* without reference to the content of the regulated speech." 475 U.S. at 47-48 (internal quotation marks omitted); *see also City of Erie v. Pap's A. M.*, 529 U.S. 277, 283 (2000) (concluding that law banning public nude dancing was content-neutral and constitutional). Justice Brennan, in his dissenting opinion in *Renton*, labeled this conclusion "misguided." He observed that any "secondary effects" may be relevant to the strength of the governmental interest behind a zoning ordinance, but that it did not change the fact that the ordinance was content based. 475 U.S. at 56-57 (Brennan, J., dissenting). Various other Justices have since endorsed Brennan's view. *See e.g.*, *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 448 (2002) (Kennedy, J., concurring in the judgment) (describing zoning ordinance as "content based" and concluding that *Renton*'s statement of content neutrality was of "something of a fiction"); *id.* at 457 (Souter, J., dissenting) (describing ordinance as "content correlated"). Nevertheless, for the purposes of our analysis here, we assume that Smithtown has not violated whatever content-neutrality requirement may apply to adult entertainment zoning ordinances.

The primary question we face here is which set of alternatives must we evaluate: those available at the time an ordinance is passed, or those available at the time it is challenged? We hold that, in assessing the adequacy of alternative sites left open by a zoning ordinance, courts must consider the adequacy of alternatives available at the time the ordinance is challenged. This evaluation should account for circumstances as they exist at the time the court issues its judgment, or as close as is practicable to that time in light of the need for discovery and the presentation of evidence, as managed by the district court.

We reach this conclusion because we believe that the First Amendment does not allow courts to ignore post-enactment, extralegal changes and the impact they have on the sufficiency of alternative avenues of communication. The alternatives available when a statute is passed can disappear, thus decreasing the adequacy of alternative sites actually available to would-be speakers. *See Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524,1532 (9th Cir. 1993) ("Land under the ocean, airstrips of international airports, [etc.] . . . are not relocation sites likely to ever become available to the Adult Businesses, or indeed to any commercial business."). Conversely, if a municipality opens up new land to development, the availability of alternative sites might very well increase, and thereby expand speakers' options, thus rendering constitutional zoning ordinances previously enacted. And even something as simple as growth in a community's population may be relevant to the adequacy of available sites. *See David Vincent, Inc. v. Broward County, Fla.*, 200 F.3d 1325, 1336 (11th Cir. 2000) (suggesting that a "community's population and size" be considered among the factors relevant to the inquiry).

Our holding requires no more than that the First Amendment inquiry be attuned to these realities.[6]

While our holding is not specifically established by existing caselaw addressing either adult entertainment zoning or time, place, and manner restrictions, we conclude that it is fully grounded in the approaches taken by the Supreme Court in *Young*, *Renton*, and their progeny. These cases focus on the practical and continuing impact of zoning regulations on adult entertainment uses *as applied*, rather than on their facial constitutionality when passed. In *Renton*, for example, the Supreme Court specifically noted that no adult uses existed in the city at the time the ordinance was passed. 475 U.S. at 44. A year later, however, the plaintiffs acquired two theaters and intended to use them to show adult films. *Id.* at 45. If the only question had been whether the challenged ordinance permitted adequate alternatives at the time it was passed, *Renton* would have virtually been a "non-case"—because there were no adult establishments in existence when the ordinance was passed, the ordinance could not have unconstitutionally limited them as of that time. The Court, of course, did not take this easy route, but rather evaluated the availability of alternatives at some date subsequent to enactment (precisely which date is unclear from the opinion). In doing so, the Court explained that "the First Amendment requires only that Renton refrain from *effectively* denying respondents a reasonable opportunity to *open* and operate an adult theater within the city." *Id*. at 54 (emphasis added); *see also Boss Capital, Inc. v. City of Casselberry*, 187 F.3d 1251, 1254 (11th Cir. 1999)

---

[6] This approach, of course, in no way relies on any kind of "evolving" First Amendment jurisprudence. The principal question—whether a law provides adequate alternatives—is the same no matter when it is considered.

(holding that, in evaluating adequacy, courts may consider the community's population and size, the acreage available to adult businesses as a percentage of the overall size, the location of available sites, the number of adult businesses already in existence, and "the number of adult entertainment establishments wanting to operate in [the community]" in the future), *abrogated on other grounds by City of Littleton, Colo. v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774 (2004).  Such an inquiry would not make sense unless "future" impact—in so far as it required courts to consider the effect of the ordinance on adult businesses that have opened or might open after the ordinance was enacted—is constitutionally relevant.  Moreover, the *Renton* Court repeatedly phrased its inquiry in the present tense, thereby suggesting that it considered the significant time to be that of the challenge, not of the law's passage: "The appropriate inquiry in this case, then, is whether the Renton ordinance is designed to serve a substantial governmental interest and *allows* for reasonable alternative avenues of communication."  *Id.* at 50 (emphasis added); *see also id.* at 53 (same); *id.* at 54 ("[W]e have cautioned against the enactment of zoning regulations that have the effect of suppressing, or greatly restricting access to, lawful speech, . . . ." (internal quotation marks omitted)).

We recognize, however, that not all courts have read *Renton* in this way, and that our holding appears to conflict with that of at least one other court—the United States District Court for the District of Maryland, on whose decision the District Court in this case relied.  In *Bigg Wolf Discount Video Movie Sales, Inc. v. Montgomery County, Md.*, 256 F.Supp.2d 385 (D. Md. 2003), the Maryland court concluded that "[a]lthough many courts have not explicitly said so, most have logically analyzed the number of available sites in relation to the number of adult businesses that would need to relocate at the time the ordinance was passed."  *Id*. at 397.  And

-11-

language in a case from the United States Court of Appeals for the Eleventh Circuit suggests a similar approach. In *Daytona Grand, Inc. v. City of Daytona Beach, Fla.*, 490 F.3d 860 (11th Cir. 2007), the court stated that "[a] new zoning regime must leave adult businesses with a 'reasonable opportunity to relocate,' and 'the number of sites available for adult businesses under the new zoning regime must be greater than or equal to the number of adult businesses in existence at the time the new zoning regime takes effect.'" *Id.* at 870 (*quoting Fly Fish, Inc. v. City of Cocoa Beach*, 337 F.3d 1301, 1310-11 (11th Cir. 2003)).

We believe that these cases *hold* no more than that courts should in the ordinary course consider the adequacy of alternative sites available when an ordinance was passed. To the extent that these cases suggest that courts should *only* consider the adequacy of alternatives existing at the time of an ordinance's passage, we disagree. The adequacy of sites left available by an ordinance at the time of its passage may be relevant to its constitutionality, and nothing in our opinion today should be read as holding to the contrary. (That issue is not before us.) But whether or not it is constitutionally necessary in some circumstances for an ordinance to preserve adequate alternatives at the time of passage, it is not constitutionally sufficient.

In addition to relying on the above-mentioned Maryland and Eleventh Circuit cases, the District Court stated that our Circuit "has implicitly found that the appropriate date for assessment of proposed alternative avenues of communication is the date of enactment." *TJS*, 2008 WL 2079044, at *7. We disagree. The District Court based its conclusion on our favorable citation, in *Hickerson*, 146 F.3d 99, to (a) *Town of Islip v. Caviglia*, 540 N.E.2d 215 (N.Y. 1989), which in turn noted that there was ample space available for adult uses after the rezoning and that there was no evidence that the number or accessibility of adult bookstores would be

-12-

diminished, and to (b) *Stringfellow's of New York, Ltd. v. City of New York*, 694 N.E.2d 407 (N.Y. 1998), in which the City was required to show sufficient "alternative receptor sites" to which existing adult uses could relocate. The lower court also pointed out that in *Buzzetti*, 140 F.3d 134, we "upheld an adult entertainment zoning ordinance, which permitted the existing adult entertainment establishments to continue operations but did not require that future adult entertainment establishments would be entitled to open at new locations." *TJS*, 2008 WL 2079044, at *8.

All that is so. But, of course, none of these cases *limits* us to considering only the adequacy of alternative sites available at the time an ordinance is passed. The statement in *Caviglia* (which we approvingly cited in *Hickerson*) that the rezoning preserved ample space for adult bookstores and did not lessen their number or accessibility does not imply, much less hold, that a statute must only provide ample alternatives at the time it is passed. Moreover, *Hickerson* specifically did *not* address the merits of the petitioners' First Amendment claims. *Hickerson*, 146 F.3d at 103 ("The *only question* before us is whether the New York courts' rejection of plaintiffs' state constitutional claims forecloses plaintiffs from relitigating, in the form of a First Amendment claim in federal court, the same issues that were resolved against them in state court.") (emphasis added). But even if we were to read the cited language as being a holding, it would not support the District Court's time-of-enactment approach. Indeed, the most natural reading of the phrase "after the rezoning" would encompass all time periods after the rezoning, not just the date of passage itself.

Similarly, in *Buzzetti* we stated that "there can be no doubt on this record that the Zoning Amendment allows for reasonable alternative avenues of communication." 140 F.3d at 140

-13-

(internal quotation marks omitted).  In support of this conclusion, we cited the district court's

finding that "[e]leven percent of New York City's total land area remains as permissible

locations for adult establishments to operate" and concluded:

> [T]he Zoning Amendment allows for the operation of approximately 500 adult establishments in New York City in comparison to the approximately 177 adult establishments currently operating in the city; accordingly, the Amendment permits all of the City's existing adult establishments to continue to operate in the City, either at their current sites or at new locations.

140 F.3d at 141 (alterations and internal quotation marks omitted).  Thus, if anything, the present

tense language of *Buzzetti*—"currently operating"; "existing"; "continue to operate"; "new

locations"—like that of *Renton*, suggests a focus on the present application of the ordinance, not

its constitutionality at the time of passage.[7]

The District Court also cited the Ninth Circuit's opinion in *Topanga Press Inc. v. City of*

*Los Angeles*, 989 F.2d 1524 (9th Cir. 1993), which the District Court described as holding that

"the number of sites available must merely be greater than or equal to the number of adult

entertainment businesses in existence at the effective date of the ordinance."  *TJS*, 2008 WL

2079044, at * 7.  We do not so read that opinion.  To be sure, the Ninth Circuit affirmed the

district court's issuance of a preliminary injunction against the ordinance in part on the basis that

the number of sites available under the ordinance would not likely accommodate all of the then-

operating adult entertainment businesses.  *Topanga*, 989 F.2d at 1532-33.  But the language of

*Topanga*—which considered the alternatives available to adult businesses that are "now in

---

[7] In *Buzzetti*, the difference between these two periods was not so great as it is here.  The ordinance in that case was passed in 1995, 140 F.3d. at 136, and the complaint was filed in 1996. *Id*. at 137.

operation"—is fully consistent with the approach we take here, which, as we have emphasized, may well permit courts *also* to consider an ordinance's constitutionally at the time it is passed. Because *Topanga* found that the challenged ordinance did *not* provide adequate alternatives at the time it was passed, the court did not find it necessary to consider whether it also failed to provide adequate alternatives at some later date. The fact that the *Topanga* court chose not to make the latter inquiry, however, in no way means that its decision precluded such an inquiry.

In arguing that adequacy should be measured exclusively at the time of the ordinance's enactment, the Town's primary concern seems to be that the rule we endorse here will permit adult entertainment businesses repeatedly to challenge the constitutionality of the same ordinance. In this regard, the Town emphasizes, and the District Court noted, that "the Town of Smithtown passed the original ordinance in 1994 and amended it in 2000, and presented a list of alternative sites in 1999 to [TJS's] predecessor." *TJS*, 2008 WL 2079044, at *8. TJS, however, "did not commence this suit until 2004, upon commencement by the Town of a closure action in State court," and in any event TJS "was aware of the nature of the restrictions upon an adult entertainment establishment when he purchased and opened the business." *Id.* And, the District Court concluded, "to ignore the history of the site between the 1994 enactment of the original ordinance and 2003 would reward recalcitrance on [TJS's] part" because it "would still fail to explain [TJS's] failure to raise specific legitimate objections to the proposed sites over the past five (5) years." *Id.* We, of course, have no problem with the proposition that the history of 490 West Jericho Turnpike should not be "ignore[d]." Giving due regard to that history, however, does not alter the basic inquiry as to whether the challenged ordinance provides adequate alternative sites.

Moreover, although the rule we endorse today might in some circumstances open ordinances up to more than one attack, it would only do so if there were significant changes in the surrounding community. And the burden of pleading and proving such charges with particularity could well be put on the plaintiff. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Furthermore, the implications of the reverse rule would be constitutionally troubling. If the only relevant question were whether an ordinance provided adequate alternatives on the day of its passage, any law that did so would thereafter be immune from First Amendment challenge. And speech that the Supreme Court has held to be protected by that Amendment would be silenced. Conversely, a strict time-of-passage rule might arguably make it impossible for a city to save a constitutionally deficient ordinance: post-enactment remedial measures taken by a city to make alternative sites more available (such as opening new land to development) would, in theory, seem to be just as constitutionally irrelevant as developments limiting the availability of such alternatives. Our holding avoids these perverse results.

**IV. Relevant Considerations for Evaluating Availability**

In addition to challenging the date of inquiry used by the District Court, TJS objects to the legal standards employed by the District Court to evaluate the adequacy of potential alternative sites. Specifically, TJS contends that the District Court applied legally erroneous standards in deciding whether sites identified by the Town of Smithtown were "available," and that the Court improperly prohibited testimony by TJS's expert witness intended to address the question of availability.

We will not review particular evidentiary rulings that were made by the District Court in the course of a trial whose result we are vacating. We also express no opinion as to the ultimate

merits of this case and the question of whether adequate alternative locations for adult businesses exist in Smithtown. This question turns on a fact-specific inquiry that the District Court will undertake on remand. We do, however, deem it appropriate to address TJS's more general challenge to the standards employed by the District Court to determine whether certain sites are available. This issue has already been briefed by both parties and argued to this Court, and it is almost certain to recur in this case. Our review of the District Court's legal conclusions is *de novo*. *See Am. Booksellers Found. v. Dean*, 342 F.3d 96, 100 (2d Cir. 2003); *see also David Vincent*, 200 F.3d at 1333 (explaining that while a district court's calculation of the number of sites available for adult business under a zoning law is a factual finding reviewed for clear error, a court's "methodology in making that calculation" is a question of law).

The Supreme Court has not precisely delineated the relevant factors for determining whether potential relocation sites are reasonably available, but it has identified certain factors as categorically *irrelevant*. In *Renton*, the Court concluded that the 520 acres that the city left open for use by adult theater sites constituted reasonable alternative avenues of communication. 475 U.S. at 53. Those 520 acres consisted of "ample, accessible real estate, including acreage in all stages of development from raw land to developed, industrial, warehouse, office, and shopping space that is criss-crossed by freeways, highways, and roads." *Id.* (alterations and internal quotation marks omitted). Reversing the Court of Appeals, the Supreme Court rejected the argument that much of this land was not "truly available" because sites were "already occupied by existing businesses," not "currently for sale or lease" or otherwise not "commercially viable." *Id.* at 53-54 (internal quotation marks omitted). In doing so, the Court made it clear that whether the acquisition and use of land might be unprofitable or commercially impracticable was not

-17-

relevant to its concept of availability. *See id.* at 54 ("[W]e have never suggested that the First Amendment compels the Government to ensure that adult theaters, or any other kinds of speech-related businesses for that matter, will be able to obtain sites at bargain prices.").

Following *Renton*, federal courts have based the availability inquiry on whether proposed sites are physically and legally available, and whether they are part of an actual commercial real estate market in the municipality. *See Hickerson*, 146 F.3d at 106-07 (quoting *Stringfellow's*, 694 N.E.2d at 417). Several factual considerations underlie the question of whether sites are part of an actual real estate market. One factor is the "the pragmatic likelihood of [sites] ever actually becoming available," *id.* at 106, to a generic commercial enterprise. Though *Renton* does not require relocation sites to be actually— as opposed to potentially—available, "the requirement of potentiality connotes genuine possibility." *Topanga*, 989 F.2d at 1531. Other significant factors relating to sites' physical characteristics include their "accessibility to the general public, the surrounding infrastructure, . . . and . . . whether the sites are suitable for some generic commercial enterprise." *Hickerson*, 146 F.3d at 106 (internal quotations omitted).

Sites that meet these criteria can qualify as available, even if they are in industrial or manufacturing zones. *See Tollis, Inc. v. County of San Diego*, 505 F.3d 935, 941 (9th Cir. 2007). Additionally, the need for a site to be developed before an adult entertainment business can relocate does not render the site unsuitable. *See David Vincent*, 200 F.3d at 1334. This does not mean that any site that is legally available under a municipality's zoning laws is necessarily suitable simply because the possibility of development or alteration theoretically exists. Where the physical features of a site or the manner in which it has been developed are "totally incompatible with *any* average commercial business," *Topanga*, 989 F.2d at 1532, or the site

-18-

lacks the basic infrastructure that is a precondition to private development, it should not be considered part of the relevant real estate market for purposes of determining availability. *See Woodall v. City of El Paso*, 49 F.3d 1120, 1124 (5th Cir. 1995) ("[I]n determining whether there are sufficient sites available, the finder of fact may exclude land under the ocean, airstrips of international airports, sports stadiums, areas not readily accessible to the public, areas developed in a manner unsuitable for any generic commercial business, areas lacking in proper infrastructure, and so on."). On the other hand, it is clear under *Renton* that whether or not sites fit the specific needs of adult businesses—or any other precise type of commercial enterprise—is constitutionally irrelevant. *See Renton*, 475 U.S. at 54; *Topanga*, 989 F.2d at 1531 ("[W]hen a relocation site suits some generic commercial enterprise, although not every particular enterprise, it . . . may be said to be part of the real estate market."). If sites are part of the commercial market generally, they are available even if they are not commercially viable for adult business specifically. *See Isbell*, 258 F.3d at 1113.

TJS does not object to this formulation for determining availability, but rather argues that the category "some generic commercial enterprise" includes only classes of businesses similar in physical characteristics to an adult entertainment business, such as "CVS Pharmacy, Wendy's and Blockbuster Video." Appellant's Br. at 16-17. Therefore, TJS contends, a fact-finder must exclude from consideration any site that is best suited for a "big box" enterprise, such as sites that are part of a large or expensive tract of land or sites zoned for industrial or warehouse usage as well as for general commercial enterprises. For example, TJS argued to the District Court that a six and three-tenths acre site (Site 17) occupied by an automobile dealership was not available because it was "too large . . . too expensive . . . and not pragmatic" for TJS. *TJS*, 2008 WL

2079044, at \*15. TJS advanced similar objections to other sites.[8] The District Court rejected TJS's argument, reasoning that a site is not unsuitable simply because it is better suited for some other commercial or industrial use. *See id.* at \*3 & n.1. The District Court therefore considered these sites available for the purpose of assessing adequacy.

We find that the District Court articulated and applied the correct standard for availability. TJS's objections to the physical size of sites and to the nature of the businesses currently operating at certain sites ultimately reduce to complaints about economic impact and commercial viability. Even if we granted that certain identified sites were better suited to large businesses, like automobile dealerships, than they were to small retail stores, it would not follow that these sites would not be part of a general commercial real estate market. It would mean only, and quite unremarkably, that there are sites that would be more profitable locations for some commercial businesses than for others. As we have explained, the possibility that sites will be unprofitable or commercially unviable for adult businesses like TJS—or even for non-adult businesses that are similar in size—is not relevant to the availability inquiry. "The ideal lot [for a particular type of business] is often not to be found." *David Vincent*, 200 F.3d at 1334. An adult entertainment establishment must compete for commercial real estate like any

---

[8] In addition, TJS objected to the availability of other sites (either in whole or in part) on different grounds. For instance, its expert witness, Steven Cataldo, claimed that some sites were environmentally sensitive because they supposedly had slopes in excess of fifteen percent and that other sites were environmentally sensitive because they were allegedly subject to methane gas contamination or were located near landfills. *See TJS*, 2008 WL 2079044, at \*9. The District Court discounted Mr. Cataldo's testimony as to these issues because he failed to conduct the appropriate examinations and tests to substantiate his concerns, and because of inconsistencies in his testimony. *See id.* at \*10-11. In its brief, TJS calls attention to the District Court's findings regarding these environmental sensitivity concerns, *see* App. Br. at 5, but TJS does not appear to challenge these findings as part of its appeal.

other market participant. And, like for other market participants, the physical size or nature of the business may affect the availability of commercially viable sites or the willingness of property owners to sell or lease to them. There are, in short, inevitable impediments to a business's relocation. But obstacles such as the possibility of "making due with less space than one desired," or "having to purchase a larger lot than one needs," do not render property unavailable for the purpose of constitutional analysis. *Id.* at 1335. Alternative sites need only be available, not attractive.

Essentially, TJS attempts to avoid the logic of *Renton* and the "prohibition against consideration of economic impact," *Topanga*, 989 F.2d at 1529, by asking us to subdivide the real estate market. TJS does not dispute that sites that are not viable for adult entertainment businesses may still be available. Rather, as outlined above, it argues that the test for whether a site is part of an actual market depends on whether the site is suitable for businesses that share similar characteristics to adult entertainment businesses. We find no support for such an approach, and we decline to adopt it. Indeed, courts have repeatedly insisted that sites are part of an actual real estate market if they are potentially suitable for commercial enterprises generally, not for a particular subset of commercial enterprises. *See, e.g.*, *Z.J. Gifts D-4, L.L.C. v. City of Littleton*, 311 F.3d 1220, 1240 (10th Cir. 2002) (refusing to exclude categorically warehouses and other large-scale manufacturing uses from the availability calculation because, under *Renton*, "industrial, warehouse, office, and shopping space[s]" were included in the list of "divers[e]" properties available for adult businesses) (emphasis omitted), *rev'd on other grounds*, 541 U.S. 774 (2004); *Isbell*, 258 F.3d at 1113 (rejecting argument by adult business that parcels occupied by car dealerships or plumbing supply outlets were not part of the relevant

-21-

business real estate market because the parcels were not economically suitable, and indicating that "'it is not relevant whether a . . . site will result in lost profits, higher overhead costs, or even prove to be commercially infeasible for an adult business'" (quoting *Topanga*, 989 F.2d at 1531)). That some sites are simply bigger than TJS desires and more expensive than it wishes does not render them unsuitable for some generic purpose or remove them from the general real estate market.

We are unconvinced by TJS's admonition that adult entertainment businesses "will cease to exist" if local governments are allowed to recognize large lot sizes as available alternatives for relocation. *See* App. Br. at 16. Even leaving aside the legal irrelevance of commercial viability concerns under *Renton*, TJS's contention that smaller commercial enterprises cannot possibly locate on larger lots is speculative. TJS ignores, for instance, the District Court's findings that certain large sites could be subdivided, and that current property owners could sublet portions of their property to smaller businesses. *See TJS*, 2008 WL 2079044, at * 15, 17-18; *see also MJ Entm't Enters., Inc. v. City of Mount Vernon, N.Y.*, 328 F. Supp. 2d 480, 484 (S.D.N.Y. 2004) (recognizing that sites that are currently in use are available despite the fact that the sites "would have to be acquired or leased, and even subdivided"). Of course, it is possible that other businesses may not wish to locate next to an adult entertainment business like TJS or to sublease to one. But "the First Amendment is not concerned with restraints that are not imposed by the government itself . . . . It is of no import under *Renton* that the real estate market may be tight . . . or that property owners may be reluctant to sell to an adult venue." *David Vincent*, 200 F.3d at 1335.

-22-

In endorsing the District Court's legal standards for the evaluation of availability, we do not ourselves now find that particular sites are or are not available. Because the District Court did not measure adequacy at the time the ordinance was challenged, we decline to speculate as to whether sites potentially available at that time provided sufficient alternatives. On remand, the District Court will determine whether there are currently adequate alternatives for relocation in Smithtown. *See supra* page **[5 n.2, 9]**. We hold only that TJS's challenge to the District Court's legal standard for determining availability—and more specifically its challenge to the District Court's definition of "generic commercial enterprise"—lacks merit.

**V. Conclusion**

While we find no flaw in the standards employed by the District Court to determine whether alternative sites proffered by a municipality are available, we conclude that the constitutionality of a zoning ordinance must be evaluated according to the alternative sites it leaves open at the time it is challenged, and not only at the time it is passed. We therefore VACATE the District Court's decision and REMAND for further proceedings consistent with this opinion.