United States Court of Appeals
Fifth Circuit

**F I L E D**

June 7, 2007

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————————

No. 05-20714

———————————————

CARL R. PRUETT; SCOTT MARTIN,

                    Plaintiffs-Appellees-Cross-Appellants,

versus

HARRIS COUNTY BAIL BOND BOARD; HARRIS COUNTY,

                    Defendants-Appellants-Cross-Appellees.

--------------------
Appeals from the United States District Court
for the Southern District of Texas
--------------------

Before HIGGINBOTHAM, WIENER, and CLEMENT, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Two bail bondsmen challenged a Texas statute restricting solicitation of potential customers as a denial of their First Amendment rights. The district court agreed. Concluding that all but one of the restrictions violates the bondsmen's right to commercial speech, we affirm, reverse, and remand, all in part.

I

Bail bondsmen Carl Pruett and Scott Martin filed this § 1983 action against Harris County and the Harris County Bail Bond Board,[1] challenging on various federal and state constitutional

_____

[1] The Board, a creature of Texas statute, is responsible for supervising and regulating the bond business and enforcing bond rules and statutes. TEX. OCC. CODE § 1704.101, .102 (2005). The State of Texas declined to intervene, hence Harris County and the Board ("Harris County") defend the statute.

grounds, including the First Amendment, a Texas statute governing solicitation of customers, TEX. OCC. CODE § 1704.109 (2003). That statute provides:

(a) A board by rule may regulate solicitations or advertisements by or on behalf of bail bond sureties to protect:

(1) the public from:

(A) harassment;
(B) fraud;
(C) misrepresentation; or
(D) threats to public safety; or

(2) the safety of law enforcement officers.

(b) A bail bond surety, an agent of a corporate surety or an employee of the surety or agent may not make, cause to be made, or benefit from unsolicited contact:

(1) through any means, including in person, by telephone, by electronic methods, or in writing, to solicit bonding business related to an individual with an outstanding arrest warrant that has not been executed, unless the bail bond surety or agent for a corporate surety has an existing bail bond on the individual; or
(2) in person or by telephone to solicit bonding business:

(A) that occurs between the hours of 9 p.m. and 9 a.m.; or
(B) within 24 hours after:

(i) the execution of an arrest warrant on the individual; or
(ii) an arrest without a warrant on the individual.

(c) This section does not apply to a solicitation or unsolicited contact related to a Class C misdemeanor.

The plaintiffs challenge subsection (b), which contains two prohibitions. Subsection (b)(1) prohibits any solicitation

2

regarding an outstanding warrant, unless the subject of the warrant is a previous customer. Subsection (b)(2) restricts the time of solicitation after arrest, prohibiting solicitation in person or by phone from 9:00 p.m. to 9:00 a.m., or within 24 hours after a person has been arrested, either with or without a warrant. The statute does not prevent attorneys, law enforcement officials, or anyone else from alerting someone that he's the subject of an open warrant. Law enforcement officials frequently send letters to petty defendants giving notice of open warrants against them, hoping they'll turn themselves in. Most serious offenders do not get bail in Texas, hence most bondsmen don't target them.

Bondsmen use several methods to solicit business. One particularly useful tool is the Harris County Justice Information Management System (JIMS), a computer system accessible to the public through terminals and the Internet which provides, *inter alia*, names and addresses of persons arrested and subjects of arrest warrants. Given the public's ease of access to JIMS, Harris County waits 48 hours after an arrest warrant is issued to post the information about the warrant on JIMS, allowing law enforcement officers to execute the warrant first.

The district court granted the bondsmen's motion for summary judgment, holding the statute unconstitutional and enjoining its enforcement. It granted in part the plaintiffs' motion for fees, awarding them $50,000 plus $25,000 in the event of appeal. Harris

County appeals the judgment, including the award of fees, and plaintiffs cross-appeal the award of fees, asking for more.[2]

## II

The metaphor of political speech finding its place in the marketplace of ideas proved to be a powerful if inexact force, drawing speech in its myriad presentations under the umbrella of First Amendment protection — the force of the metaphor itself a validating testament to the power of an idea so strong as to invite confusion of metaphorical imagery with defining principle. And in 1975, with the Supreme Court's decision in *Bigelow v. Virginia*,[3] speech in the marketplace of actual goods itself gained protection, albeit as "less valuable speech," termed "commercial speech." It signifies that commercial speech did not displace otherwise protected speech in gaining First Amendment protection. That a book or article is sold or a column is written for compensation

---

[2] In early 2001, Harris County adopted by local rule solicitation restrictions similar to those of current § 109(b). Later that year, the Texas legislature enacted the original version of § 109, which allowed local boards to regulate solicitation. In 2002, plaintiff Pruett challenged the local rules in state court. The trial court held the rules unconstitutional, *see Harris County Bail Bond Board v. Pruett*, No. 01-02-01043-CV, 2004 WL 2307362 (Tex. App. -Houston [1 Dist.] October 14, 2004, no pet. h.), the appellate court partially reversed, 177 S.W. 3d 260 (Tex. App. 2005), and the case is pending before the Supreme Court of Texas. The present case involves current § 109(b), which was enacted in 2003 but concerns issues similar to those in the state court case. However, the present case involves a central issue of federal constitutional law, and although we abstain from ruling on issues of Texas constitutional law, *see Railroad Commission v. Pullman Co.*, 312 U.S. 496 (1941), we rarely abstain from ruling on federal constitutional law, *see Pennzoil v. Texaco, Inc.*, 481 U.S. 1 (1987); *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), and do not do so here.

[3] 421 U.S. 809 (1975).

does not eliminate its protection.[4]  In sum, commercial speech, with its lesser protection, is at bottom advertising.  As the parties and the court below recognized, § 1704.109 is a restriction on commercial speech.

Restrictions on commercial speech are analyzed under the framework of *Central Hudson*.[5]  The government may ban misleading commercial speech and commercial speech related to illegal activity.  "If the communication is neither misleading nor related to unlawful activity, the government's power is more circumscribed."  First, "[t]he State must assert a substantial interest to be achieved by restrictions on commercial speech."  Second, "the restriction must directly advance the state interest

---

[4] *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 761-62 (1976).

[5] *See Central Hudson Gas & Elec. Corp. v. Pub. Serv. Commission of New York*, 447 U.S. 557, 563-64 (1980).  The parties quarrel about what level of scrutiny *Central Hudson* mandates.  Citing *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996), the plaintiffs urge something "akin to strict scrutiny." *44 Liquormart*, however, was a plurality opinion involving "a blanket prohibition against truthful, nonmisleading speech about a lawful product," *id.* at 504, and there's no blanket prohibition here.  In any event, the Supreme Court has called *Central Hudson* a form of "intermediate" scrutiny. *See Edenfield v. Fane*, 507 U.S. 761, 767 (1993); *see also Florida Bar v. Went for It, Inc.*, 515 U.S. 618, 623 (1995); *cf. Thompson v. Western States Medical Center*, 535 U.S. 357, 374 (2002) (describing the test as "significantly stricter" than rational basis).  The precise label for the level of scrutiny embodied in *Central Hudson* is irrelevant, however - we just apply the test. Likewise, the plaintiffs' assertion that the *Central Hudson* test isn't the same as the time, place, and manner test, while true, *see Speaks v. Kruse*, 445 F.3d 396, 400 n.10 (2006), is axiomatic.
The plaintiffs also suggest that strict scrutiny should apply because the restrictions here are content-based.  This argument has no merit - § 1704.109 is a classic restriction on a category of commercial speech, a restriction that involves methods, times, and subjects of solicitation and does not have as a goal the suppression of speech. *See, e.g., Speaks*, 445 F.3d at 400 (examining similar restriction on chiropractor solicitation as a restriction on commercial speech).

involved." Third, "if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive."[6]  We review the lower court's application of this test *de novo*.[7]

Before we apply *Central Hudson* to the two restrictions at issue, we address a fundamental dispute coloring much of the parties' arguments and the lower court's ruling.  The plaintiffs argue that only evidence created before enactment of § 1704.109 and relied upon or cited by the legislature in passing it can be considered under *Central Hudson*.  Consequently, they argue, because the legislative record behind § 1704.109 is bare, it cannot survive scrutiny.  Harris County disagrees, offering testimony and affidavits introduced in the court below.  The district court agreed with the plaintiffs, although it held that § 1704.109 failed scrutiny even considering Harris County's additional evidence.

*Central Hudson* does not require that evidence used to satisfy its strictures exist pre-enactment.  Plaintiffs rely heavily on the statements in *Edenfield v. Fane* that a statute cannot be justified "by mere speculation or conjecture" and that "[t]he *Central Hudson* standard does not permit us to supplant the precise interests put

---

[6] *Central Hudson*, 447 U.S. at 564.  Despite the language of the third prong, the Supreme Court and, thus, this court do not require that the state use the least-restrictive means.  *See, e.g., Speaks*, 445 F.3d at 401 n.14.

[7] *See Speaks*, 445 F.3d at 399.

forward by the State with other suppositions."[8]  Those statements, however, only distinguish between rational basis review, under which a court can, and should if necessary, confect its own reasons to justify a statute, and *Central Hudson* review, under which a court can consider only the reasons proffered by the state.  While with commercial speech the state need not demonstrate that its regulatory means were the least intrusive on protected speech,[9] it must at least articulate regulatory objectives to be served.  But that doesn't mean the state can proffer only reasons locatable in the legislative record.  Indeed, in our most relevant case, *Moore v. Morales*, the court's language shows that it considered post-enactment evidence in analyzing a *Central Hudson* claim.[10]  Even with a First Amendment doctrine calling for "intermediate scrutiny," where the argument has some logical purchase, that of sexually-oriented businesses, we have specifically rejected the plaintiffs' contention that evidence of purpose must be drawn only from a contemporaneously generated legislative record.  And there the threshold question is whether the legislative body is regulating

---

[8] 507 U.S. 761, 768, 770 (1993); *see also Went for It*, 515 U.S. at 624 (quoting *Edenfield*).  The plaintiffs cite to other cases, like *U.S. West, Inc. v. F.C.C.*, 182 F.3d 1224 (10th Cir. 1999), which simply restate this rule.

[9]  *See supra* note 4.

[10] 63 F.3d 358, 362-63 (5th Cir. 1995) (stating "[b]efore us is extensive evidence" and, twice, "[t]hey testified").  In their brief, plaintiffs suggest that this "evidence" and "testimony" was actually pre-enactment "evidence" and "testimony," presumably created in connection with the legislation itself.  The district court's ruling, however, makes clear that the evidence was developed at trial.  *See Moore v. Morales*, 843 F. Supp. 1124 (S.D. Tex. 1994).

7

protected activity or its effects.[11]  We consider the testimony and affidavits introduced by Harris County in the court below, as the district court did in the alternative.

A

We turn first to subsection (b)(1), which prevents solicitation regarding outstanding warrants unless the bondsman has a prior relationship with the party.  Harris County concedes that the solicitations at issue are neither deceptive nor relate to illegal activity.  Next, under the first prong of *Central Hudson*, Harris County asserts as substantial interests the diminishment of: 1) the flight risk for felony offenders and high-level misdemeanor offenders; 2) the risk of harm to officers, defendants, and bystanders when such defendants are arrested; 3) the risk of harm to victims, family members, or witnesses from retribution; and 4) the potential for destruction of evidence, interests alluded to in the statute itself.[12]  The district courts found that these

---

[11] *See Illusions-Dallas Private Club, Inc. v. Steen*, 482 F.3d 299 (5th Cir. 1997) (rejecting argument that legislative record or statutory preamble was necessary to discern a content-neutral purpose for statute); *J&B Entm't, Inc. v. City of Jackson*, 152 F.3d 362, 371 (5th Cir. 1998) (allowing use of evidence of secondary effects developed pre-enactment or adduced at trial). Plaintiffs cite other cases that seem to disagree, *see Peek-a-Boo Lounge of Bradentown, Inc. v. Manatee City*, 337 F.3d 1251, 1265-67 (11th Cir. 2003); *Hickerson v. City of New York*, 146 F.3d 99, 105 (2d Cir. 1998); *11126 Baltimore Blvd. v. Prince George's County*, 886 F.2d 1415, 1423 (4th Cir. 1989), *judgment vacated by* 496 U.S. 901 (1990); *SOB, Inc. v. County of Benton*, 317 F.3d 856, 862 (8th Cir. 2003); *D.H.L. Associates v. O'Gorman*, 199 F.3d 50, 57-58 (1st Cir. 1999), but those cases aren't controlling, of course.

[12] The plaintiffs argue that the legislature's purpose in enacting § 109 was to hinder competition between large, affiliated bondsmen and independent bondsmen, but it offers no real evidence for this claim.  In any event, even if the impulses behind § 109 were anti-competitive, § 109 could still be supported by other, legitimate interests.

interests were substantial.  We agree, although to the extent that Harris County itself notifies non-serious offenders of open warrants against them - and the evidence shows that Harris County does this quite a bit - the interests are not substantial at all. Deferring that concern to the third prong, where it more easily fits, and assuming the interests are substantial in the abstract, we turn to the second prong.

Under the second prong, Harris County must show that (b)(1) directly advances these interests.  It has failed to do so.  Harris County's experts testified that executing arrest warrants is dangerous and that maintaining the "element of surprise" is important in decreasing the target's ability to flee, resist, harm people, or destroy evidence.  Although we consider this testimony, it is not enough in the absence of any sort of data or even anecdotal evidence showing that bond-eligible targets, thus excluding hard-core criminals,[13] who aren't caught during the 48-hour JIMS delay, are tipped off by bondsmen and then choose to run, resist, or destroy evidence.  Harris County urges that requiring such evidence would preclude the prevention of tragedies through prophylactic laws, but there must be some evidence that (b)(1) responds to an actual problem before we can conclude that it

---

[13] Section 109(c) excludes solicitation related to Class C misdemeanors, providing some leeway for bondsmen to call petty defendants, but we have no evidence or argument about what portion of bond-eligible defendants are Class C misdemeanor defendants or the relative dangerousness of such defendants to other categories of defendants.

advances any interests.[14]  And even if Harris County has shown that the statute advances the interest in some minor way, such a "remote" or "marginal" advancing of the state's interest is insufficient.[15]

Even assuming that (b)(1) advances the stated interests, (b)(1) fails prong three of *Central Hudson*.  While that prong does not require that the state employ the least-restrictive means to accomplish it goals,[16] it does require a good fit between the means and the goals.  Consequently, in determining whether "the means are in proportion to the interests they purport to serve,"[17] it is relevant that other, less-restrictive and more-tailored means exist.  As the district court found, Harris County could advance its interests by: 1) increasing the number of officers executing warrants, thereby arresting risky offenders before the 48-hour JIMS window expires; 2) extending the 48-hour window; and 3) screening targets for those who could be notified.  As we have observed, it is telling that Harris County itself notifies thousands of people every year of open warrants against them[18] - Harris County cannot

---

[14] Apparently sensing its problems with lack of evidence, Harris County argues that "common sense" alone supports it here, citing *Went For It*, 515 U.S. at 628.  *Went for It*, however, noted that common sense together with history and consensus can justify a speech restriction.

[15] *See 44 Liquormart*, 517 U.S. at 505-06.

[16] *See supra* note 4.

[17] *See Speaks*, 445 F.3d at 400.

[18] In 2002, a Sheriff's Department Sergeant testified that five night-clerks in the Warrants Division send "more than 20" and perhaps as many as 100 of those letters every night, yielding 7,300 to 36,500 a year.

give such notice itself and then claim that restricting notice by others is necessary to the safety of its officers and the public and the prevention of flight. While the first two alternatives may be impractical and the second outside the legislature's control, at least we will accept for now that these two do not leave an untailored fit of ends and means. The third, however, is fatal. We do not hold that Harris County cannot serve its objectives by more narrowly drawn means. Rather, we hold that Harris County has not yet engaged in the narrow tailoring demanded by the First Amendment.

B

We turn next to subsection (b)(2), which prevents solicitation in-person or by phone between 9:00 p.m. and 9:00 a.m. and within 24 hours after arrest. Harris County contends first that (b)(2)(A) regulates conduct that was already unlawful under the general statute prohibiting solicitation between 9:00 p.m. and 9:00 a.m. and before noon on Sundays, TEX. BUS. & COM. CODE § 37.02(a)(2), hence under the threshold inquiry of *Central Hudson*, (b)(2)(B) survives as a ban on speech relating to illegal activity.[19] This bootstrapping argument fails. The threshold inquiry asks whether the speech is misleading or the product or service spoken about is

---

[19] In analyzing the second prong on *Central Hudson*, the district court concluded that § 37.02(a)(2) covers only solicitations of a "consumer good or service," and that bail bonding isn't such a good or service. Although we don't pass on the question, we note that § 37.02(a)(2) seems to cover bail bonding, as the Texas Court of Appeals held in Pruett's related case, *see Harris County Bail Bond Board v. Pruett*, 177 S.W. 3d 260, 275-76 (Tex. App. 2005).

illegal, and here the speech isn't misleading and the product or service itself - bail bonding - isn't illegal.  That § 37.02(a)(2) itself bans speech doesn't save (b)(2)(B).  And so we turn to the *Central Hudson* prongs.

Harris County asserts as its substantial interest for (b)(2) the prevention of harassing solicitation, essentially what we have elsewhere called the interest of "privacy," a sufficient interest.[20] But Harris County's argument finds difficulty when its interest is stated more narrowly as the prevention of harassment through bail solicitation and the promotion of privacy of families of persons targeted for arrest.  It now differs from solicitation held to be a valid target of legislation.[21]  We defer this concern to the next prong, again assuming the interests are substantial in the abstract.

We conclude that the 24-hour window of (b)(2)(B) does not directly advance the state's interest.  Harris County offers an affidavit from an employee of the Harris County District Attorney's Office stating that the 24-hour period after arrest is the time during which harassing bond solicitations are the worst and that citizen complaints "declined drastically" after Harris County changed its local rules, before the enactment of § 109, to contain essentially what is now § 109.  Again, however, the state fails to

---

[20] *See Speaks*, 445 F.3d at 400 n.13.

[21] *See, e.g., id*.

12

carry its burden with a single affidavit, bereft of data or even anecdotes, that the 24-hour rule advances the state's interest. Moreover, Harris County fails to explain why, with the implementation of a 24-hour rule, harassing solicitations won't simply begin on the 25th hour. Nor does the County connect the reduction in citizen complaints to the 24-hour rule, as opposed to the other aspects of the amended local rules,[22] or answer the common-sense argument that most families would like to know when their members are in jail. This last point has further import given the plaintiffs' unchallenged assertion that call-blocking and call-ID systems that block calls from jail, combined with delays in booking and broken phones in jail, make it difficult for a person in custody to request help from family and friends.

All that remains is the 9:00 p.m. to 9:00 a.m. restriction. The district court struck that down with the rest of § 109(b), but its rationale for doing so is unclear, although the court seemed to rely partly on its conclusion that the general solicitation timing statute, § 37.02(a)(2), didn't apply to bail bonding. We don't decide that question,[23] although we note that if § 37.02(a)(2) covers bail bonding, then presumably we can't strike down (b)(2)(A) without striking down § 37.02(a)(2), at least "as applied" to bail bonding. We don't face that dilemma because we conclude that

_____

[22] Harris County also provides no evidence about the nature of the complaints pre- and post-rule change, preventing any useful conclusion from the reduction in complaints.

[23] *See supra* note 19.

13

(b)(2)(A) survives *Central Hudson* scrutiny.  Prohibiting in-person and telephone solicitation at late hours directly and substantially furthers privacy and the prevention of harassing solicitation, and is narrowly tailored to furthering that goal.  A nighttime prohibition is inevitably underinclusive because privacy may be lost and harassing solicitation made during the day, but surely the state's interest is more powerful at night.  Indeed, we've found no successful challenges to general nighttime solicitation bans.

### III

The plaintiffs also attacked § 109 below on vagueness, equal protection, and Texas law grounds.  The district court never addressed these arguments after concluding that § 109 violated the First Amendment.  The plaintiffs raise the vagueness and equal protection challenges again on appeal, saying nothing of Texas law. Hence we must address the vagueness and equal protection arguments as they pertain to (b)(2)(A), the subsection of § 109 most resistant to those arguments.  First, (b)(2)(A) is not unconstitutionally vague; two specific types of solicitation of a specific service are banned during a specific time.[24]  Second, the plaintiffs' equal protection argument relies entirely on the distinction in (b)(1) between bondsmen with existing client relationships and bondsmen without such relationship - a distinction irrelevant to (b)(2)(A).

---

[24] *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982).

14

Consequently, we affirm the district court's grant of summary judgment to plaintiffs, except for that part enjoining the enforcement of (b)(2)(A), which we must reverse.

IV

Under 42 U.S.C. § 1988, the district court awarded the plaintiffs $50,000 in fees and $25,000 more in the event of appeal. In its August 18, 2005 notice of appeal, Harris County appealed both the underlying merits and that award of fees. After later, unsuccessful attempts to modify that award, the plaintiffs cross-appealed the issue of fees, asking that we award more money or remand with instructions to award more money.

At the outset, the parties skirmish over whether the plaintiffs' cross-appeal was timely,[25] a skirmish we need not address because Harris County's appeal, including an appeal of fees awarded, was timely. We vacate and remand the award of fees given Harris County's partial, if limited, success, in defending the nighttime restriction. We must vacate and remand the award of fees to allow the district court to award fees appropriate to plaintiffs' now partial success in both the district court as well as on appeal.[26]

---

[25] *Browder v. Director, Dep't of Correction*, 434 U.S. 257, 264 (1978) (holding that a timely notice of appeal is jurisdictional).

[26] *See Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983) (explaining that, under § 1988, a party cannot recover fees for legal services on unsuccessful claims, although sometimes unsuccessful and successful claims can be so related as to warrant fees for time spent on the combined claims).

15

We AFFIRM IN PART and REVERSE IN PART the district court's decision on the merits.  We VACATE AND REMAND the district court's award of fees for further consideration.