**Carl R. PRUETT and National American Insurance Company, Appellants,**

v.

**The HARRIS COUNTY BAIL BOND BOARD, Appellee.**

No. 01–09–00384–CV.

Court of Appeals of Texas, Houston (1st Dist.).

April 7, 2011.

Rehearing Overruled Aug. 4, 2011.

David A. Furlow, Morgan Lindsey Gaskin, Thompson & Knight LLP, Houston, TX, for Appellants.

Edward J. Mahar, Bruce Powers, Assistant County Attorney, Houston, TX, Toni Hunter, Douglas M. Becker, Gray & Becker, P.C., Austin, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices ALCALA and MASSENGALE.

## OPINION

SHERRY RADACK, Chief Justice.

This appeal involves a challenge to an award of attorneys' fees pursuant to the Civil Rights Attorneys' Fees Award Act (42 U.S.C. § 1988) arising out of claims made against the Harris County Bail Bond Board under Title 42, Section 1983 of the United States Code. Appellants, Carl R. Pruett and National American Insurance Company (collectively, "Pruett"), bring two issues challenging the adequacy of the trial court's award. We also consider the trial court's denial of Pruett's motion to recuse. We reverse and remand.

## BACKGROUND

*The Board Enacts Rules Regarding Bond Solicitation*

In the 1990s, the Harris County Bail Bond Board ("the Board") began receiving complaints concerning bail bond solicita-

tion practices in the County. Specifically, there were complaints about bondsmen (1) contacting defendants with unexecuted warrants thereby "tipping off" the defendants about their impending arrests and increasing risks of flight, destruction of evidence, and harm to crime victims and police officers; and (2) soliciting business by telephone during non-business hours.

In response, the Board passed two local rules governing the solicitation of bail bond business in Harris County. Rule 24 prevented the solicitation of bond business from a defendant with an outstanding warrant. Rule 25 placed time restrictions on the solicitation of bond business by prohibiting solicitation of bond business (1) within the first 24 hours after an arrest; and (2) during non-business hours.

*The State Court Trial Proceedings*

Soon thereafter, the Board suspended the bonding license of appellant, Carl Pruett, for violating Rules 24 and 25. Pruett and National American Insurance Company, the insurance and surety company for which Pruett acted as an agent, filed suit against the Board requesting declaratory and injunctive relief. The trial court granted a temporary restraining order and then a temporary injunction to prevent the Board from enforcing its rules.

*The Interlocutory Appeal before this Court*

The Board filed an interlocutory appeal, which this Court dismissed after the trial court granted Pruett a permanent injunction, thereby mooting the interlocutory appeal. *See Int'l Fid. & Ins. Co. v. Pruett,* No. 01–02–00438–CV, 2002 WL 31839202 (Tex.App.-Houston [1st Dist.] Dec. 19, 2002, no pet.) (not designated for publication).

*The 2nd Appeal before this Court*

The Board then appealed the permanent injunction to this Court. This Court upheld the constitutionality of Rule 24 and the portion of Rule 25 that prevented the solicitation of bond business during non-business hours. However, this Court concluded that the portion of Rule 25 that prohibited bondsmen from soliciting businesses within the first 24 hours after an arrest was an unconstitutional restraint on free speech. *See Harris Cnty. Bail Bond Bd. v. Pruett,* 177 S.W.3d 260 (Tex.App.-Houston [1st Dist.] 2005), aff'd in part, rev'd in part, 249 S.W.3d 447 (Tex.2008).

*The Appeal to the Texas Supreme Court*

The Board then appealed to the supreme court, which ultimately affirmed this Court's holding as to the constitutionality of the "non-business hours" portion of Rule 25 and the unconstitutionality of the portion of rule 25 that prohibited the solicitation of bond business within the first 24–hours after arrest. However, the supreme court reversed this Court's judgment as to the Rule 24, holding that its prohibition against the solicitation of bond business from defendants with open warrants was also an unconstitutional restriction on free speech. *See Pruett v. Harris Co. Bail Bond Bd.,* 249 S.W.3d 447, 460–61 (Tex. 2008). The supreme court remanded the case to the trial court for further proceedings.

*The Parallel Federal Court Proceeding*

At the same time the present case was pending in the state court, a parallel proceeding was transpiring in the federal courts. In the federal proceeding, Pruett and another bondsman challenged the constitutionality of state statutes that had been passed, which mirrored the Board rules that were the subject of the state court case. *See Pruett v. Harris Cnty. Bail Bond Bd.,* 499 F.3d 403, 407–08 (5th Cir.2007). The Fifth Circuit reached the same result as the Texas Supreme Court— it held that the prohibitions against soliciting bond business when a warrant was outstanding or within the first 24–hours

after arrest were unconstitutional, but that the prohibition against "after-hours" solicitation was valid. *Id.* at 416. The Fifth Circuit also reversed the trial court's award of "nominal" attorney's fees after considering and rejecting the Board's argument that "special circumstances" should preclude or reduce the plaintiffs' recovery of attorneys' fees. *Id.* at 417–18.

The attorneys' fee issue was remanded to the federal trial court, and after an evidentiary hearing, the federal trial court awarded Pruett $588,462.83 in attorneys' fees. *Pruett v. Harris Cnty. Bail Bond Bd.*, 593 F.Supp.2d 944, 948 (S.D.Tex. 2008). The Board did not appeal the attorneys' fees awarded in the federal case.

*The Fee Hearing after Remand*

After the Texas Supreme Court ruled in his favor and remanded the state court case to the trial court, Pruett filed his fee application. The parties stipulated that Pruett was a prevailing parties under 42 U.S.C. § 1988. By affidavit, the Board's expert, Jay Aldis, testified that if the plaintiffs were entitled to recover attorneys' fees, the appropriate amount would be $326,327.52, which was to be calculated at a rate of $330 an hour for David Furlow, lead counsel for Pruett. In contrast, Furlow proffered two fee calculations: $674,625.54 (at a $450 hourly rate for Furlow) and $782,195.93 (at a $510 hourly rate for Furlow). At the close of the fee hearing, the trial court ruled as follows:

I have considered all of the evidence in my file. At this time I will take judicial notice of the evidence that's in the file. I have heard the arguments of counsel, considering all of the orders that have come before this Court in this case. I am now prepared to make a decision as to the reasonable and necessary attorney's fees in this case and that fee is $35,000, $10,000 for the original lawsuit, $10,000 for one appeal, the next appeal

is $10,000, and $5,000 for the appeal to the Texas Supreme Court. That's the decision of the Court. Gentlemen, you are excused.

*The Trial Court's Findings of Fact and Conclusions of Law*

The trial court subsequently made the following findings of fact:

1. From February 2002 through December 3, 2008, Thompson & Knight, LLP billed the Plaintiffs, on an agreed hourly rate basis, a total of $434,697.60 for work performed on Cause No. 2002–09290 and Cause No. 2002–09290–A.

2. In their motion to recover attorney's fees the Plaintiffs requested an award of as much as $782,195.93 (almost 180 percent of the billed amount).

3. The amount of fees requested by the Plaintiffs for the work performed in this case is so clearly excessive that it shocks the conscience of the Court.

4. The Court finds that, in order to discourage the filing of fee applications as outrageous as the application in the instant case, the Plaintiffs' attorney's fee award should be drastically reduced.

5. The Court finds that, under the circumstances present in this case, the sum of $35,000 should be awarded to the Plaintiffs as reasonable attorney's fees, i.e., $10,000 for the work performed in this Court, $10,000 for the first appeal, $10,000 for the second appeal, and $5,000 for the appeal to the Texas Supreme Court.

The Court also made the following conclusions of law:

1. Prevailing parties should request only reasonable fees in civil rights cases.

2. The filing of outrageous fee applications should not be condoned. *Scham v. District Courts Trying Criminal Cases*, 148 F.3d 554, 559 (5th Cir.1998).

3. The Court concludes that it is appropriate in the instant case, in the exercise of the Court's discretion, to drastically reduce the fee award in order to discourage the filing of excessive fee applications.

## PROPRIETY OF ATTORNEYS' FEES AWARD

In his first and second issues, Pruett contends that the trial court abused its discretion in denying him "almost all [attorneys'] fees in the absence of any special circumstances warranting such punishment." Pruett points out that the trial court's award was just 10% of what the Board's own expert testified would be a reasonable fee.

*Applicable Law and Standard of Review*

■■■■ The Civil Rights Attorneys' Fees Act provides that "[i]n any action or proceeding to enforce a provision of [42 U.S.C. § 1983], the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988. The purpose of § 1988 is to ensure effective access to the judicial process for people with civil rights grievances. *Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983). When a statute provides for an award of attorneys' fees, an award should be given unless "special circumstances" render the award unjust. *Blanchard v. Bergeron*, 489 U.S. 87, 89 n. 1, 109 S.Ct. 939, 942, 103 L.Ed.2d 67 (1989). Given the strong policy behind § 1988 of awarding fees to prevailing plaintiffs, defendants must make an "extremely strong showing" of special circumstances to avoid paying attorneys' fees, and the trial court's discre-

tion to deny § 1988 fees is extremely narrow. *Pruett*, 499 F.3d at 417. " 'To avoid the risk of remand the district court should explain with a reasonable degree of specificity the findings and reasons' upon which an award of attorneys' fees—or the denial of such an award—is based." *Scham v. District Courts Trying Criminal Cases*, 148 F.3d 554, 559 (5th Cir.1998) (quoting *Von Clark v. Butler*, 916 F.2d 255, 259 (5th Cir.1990)). Determining a reasonable attorneys' fee is a matter committed to the sound discretion of the trial judge, but the judge's discretion is not unlimited. *Perdue v. Kenny A.*, —— U.S. ——, 130 S.Ct. 1662, 1676, 176 L.Ed.2d 494 (2010). It is essential that the judge provide a reasonably specific explanation for all aspects of a fee determination. *Id.* Unless such an explanation is given, adequate appellate review is not feasible. *Id.*

*The Lodestar Method*

■■■■ We begin by noting that attorneys' fees under § 1988 are usually determined by applying the "lodestar" method, which is a two-step process. *Rutherford v. Harris Cnty.*, 197 F.3d 173, 192 (5th Cir. 1999). First, the court calculates the "lodestar," which is equal to the number of hours reasonably expended multiplied by the prevailing hourly rate in the community for similar work. *Id.* The court should exclude all time that is excessive, duplicative, or inadequately documented. *Watkins v. Fordice*, 7 F.3d 453, 457 (5th Cir. 1993). Once the lodestar amount is calculated, the court may adjust it upward or downward based on the twelve factors set forth in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974).[1]

---

1. The *Johnson* factors consist of the following: (1) the time and labor required for the litigation; (2) the novelty and difficulty of the questions presented; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances;

The lodestar amount is presumed to be a reasonable attorneys' fee. *Perdue*, 130 S.Ct. at 1673.

However, the trial court did not apply the lodestar method in this case. Instead, the trial court concluded that the fees "shocked the conscience" and should be "drastically reduced."

*Scham v. District Courts Trying Criminal Cases*

The Board argues that, because the trial court could have denied attorneys' fees entirely under the authority of *Scham v. Dist. Courts Trying Criminal Cases*, it could also "drastically reduce" the fee award without regard to the lodestar amount. 148 F.3d 554. We disagree in this case.

In *Scham*, the plaintiff successfully challenged as *ultra vires* an order by the Harris County administrative judge that prohibited the district clerk and sheriff from disclosing the addresses and telephone numbers of criminal defendants until an attorney was either hired or appointed. 148 F.3d at 556. The case was pending for only one year and discovery was limited. *Id.* at 558. There were no meetings of the parties or attorneys, no settlement negotiations, no mediation, no court appearances, and no trial. *Id.* The facts were stipulated, and the case was resolved by way of a motion for summary judgment. *Id.* at 557, 558. Nevertheless, appellant's counsel claimed in his fee request to have worked on the case for 936 hours at $375 an hour, with an enhancement of the lodestar to $750 an hour. *Id.* at 558. There was evidence at the record that the usual rate for a solo practitioner

with less than two years experience was $100 per hour, and plaintiff's own expert testified that counsel's work was worth $350. *Id.* at 558 n. 18. Plaintiff's expert made no attempt to show the value of his services in relation to others in the community in which he practiced. *Id.* at 558. The Fifth Circuit held that this request was so clearly excessive that it "shock[ed] the conscience" of the Court. *Id.* at 558–59. Accordingly, the trial court did not abuse its discretion in denying an award of any attorneys' fees at all under the special circumstances presented by the case. *Id.* at 559. To hold otherwise, the court believed, would be to "condone and encourage such outrageous petitions." *Id.*

*Analysis*

We begin by noting that the trial court in this case did not deny all attorneys' fees—instead, it "drastically reduced" them. The Fifth Circuit has questioned whether "special circumstances" can be used to justify the reduction, rather than elimination, of attorneys' fees. *See Pruett*, 499 F.3d at 418 ("Even if defendants had made an extremely strong showing that rose to the level of special circumstances, this circuit has never held that such 'special circumstances' can serve to reduce, and not fully eliminate, an award of fees.").

Furthermore, even if special circumstances can be used to justify the reduction rather than elimination of an attorneys' fee award, the Board has not presented an "extremely strong showing" of such special circumstances in this case. Here, the trial court's findings of fact and conclusions of law indi-

(8) the amount involved and the result obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Johnson*, 488 F.2d at 717–19. The court, however, should note that many of these factors are usually subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate. *Hensley*, 461 U.S. at 434 n. 9, 103 S.Ct. at 1940.

cate that the trial court found that the fee request "shock[ed] the conscience" of the court because the amount requested in the fee application was almost 180 percent of the amount plaintiffs' counsel actually billed his clients. The trial court's assumption seems to be that the amount an attorney charges the plaintiff determines what is a "reasonable" fee under § 1988. Such is not the case.

The Supreme Court addressed the effect of private fee arrangements in determining a reasonable fee in the case of *Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989). In *Blanchard*, the trial court reduced the attorneys' fees under the lodestar calculation because it determined that a contingency fee agreement served as a cap on the amount of attorneys' fees to be awarded. 489 U.S. at 90, 109 S.Ct. at 942–43. The Supreme Court reversed, holding that a private fee arrangement is not a cap on what is a reasonable fee, but is merely one factor to be considered in determining the reasonableness of the fee under the lodestar method. 489 U.S. at 93, 109 S.Ct. at 944. In so holding, the Court stated:

> Should a fee agreement provide less than a reasonable fee calculated [using the lodestar method], the defendant should nevertheless be required to pay the higher amount.

> Thus it is that a plaintiff's recovery will not be reduced by what he must pay his counsel. Plaintiffs who can afford to hire their own lawyers, as well as impecunious litigants, may take advantage of this provision. And where there are lawyers or organizations that will take a plaintiff's case without compensation, that fact does not bar the award of a reasonable fee. All of this is consistent with and reflects our decisions in cases involving court-awarded attorney's fees.

489 U.S. at 93–94, 109 S.Ct. at 944–45. *Blanchard* makes it clear that private fee arrangements do not determine whether a fee is reasonable, and that a private fee arrangement is not a cap on the reasonable fee that may be awarded. That Pruett's counsel billed them less than they requested in their fee application does not mean that the fee requested is unreasonable. It could be that counsel had agreed to work for a lower hourly wage so that plaintiffs could afford to proceed with the litigation with the hope of recovering more later. Indeed, the record shows that Furlow billed Pruett at a discounted rate from that usually charged by his firm.

The Board also argues that the fee request was also unreasonable because it asked for attorneys' fees at current rates, while counsel actually billed Pruett at lower rates. The Board contends that "[t]here simply was no reasonable justification in this case for the Plaintiffs to seek to recover more than they paid their own counsel[.]"

And, as we have already held, the private fee arrangement between counsel and plaintiff does not determine the reasonableness of an attorneys' fee. A private fee arrangement between the plaintiff and his attorney is but one factor to consider in conducting a lodestar analysis. *See Blanchard*, 489 U.S. at 93, 109 S.Ct. at 944. Similarly, compensation at current, rather than historic rates may be available as an enhancement to the lodestar amounts in cases that involved protracted litigation. *See Missouri v. Jenkins*, 491 U.S. 274, 283–84, 109 S.Ct. 2463, 2469, 105 L.Ed.2d 229 (1989). Partial success is also a factor that may be used to reduce an attorneys' fee award under the lodestar method. *See Pruett*, 499 F.3d at 418.

However, neither the existence of a private fee arrangement at less than that requested, nor a request for fees at cur-

rent rates, nor partial success is a "special circumstance" justifying the abandonment of any lodestar analysis and the effective denial of attorneys' fees.

The trial court in this case made no other findings of fact or conclusions of law that would explain the "special circumstances" making the fee request so unreasonable such that the conscience of the court was shocked. The Supreme Court and the Fifth Circuit have both admonished trial courts "to provide a reasonably specific explanation for all aspects of a fee determination." *Perdue,* 130 S.Ct. at 1676. (2010). Unless such an explanation is given, adequate appellate review is not feasible. *Id.; Scham,* 148 F.3d at 559 (holding that to avoid remand, district court should explain with "reasonable degree of specificity" reasons for denial of attorneys' fees). Because the only reason given by the trial court to justify its award is a lodestar factor to be considered, but does not determine the reasonableness of a fee request, we cannot conclude based on that reason alone that the amount of fees requested is so clearly excessive that it shocks the conscience. Because the trial court did not provide any other reason for its decision or conduct a lodestar analysis, we are unable to adequately address on appeal the reasonableness of the amount awarded.

Accordingly, we sustain Pruett's first and second issues on appeal.

## DENIAL OF MOTION TO RECUSE

After the fee hearing, but before a judgment was signed, Pruett filed a motion to recuse the trial judge. The motion was referred to the presiding judge of the administrative district ["the administrative judge"] who, after an evidentiary hearing on the motion, denied it. In their third issue on appeal, Pruett contends the ad-

ministrative judge erred in denying his motion to recuse.

*Standard of Review and Applicable Law*

Recusal is warranted when: (1) the trial judge's impartiality might reasonably be questioned, or (2) the judge has a personal bias or prejudice concerning a party or the subject matter of the case. TEX.R. CIV. P. 18b(2)(a)-(c). We review the denial of a motion to recuse for abuse of discretion. *Vickery v. Vickery,* 999 S.W.2d 342, 349 (Tex.1999); *see also* TEX.R. CIV. P. 18a(f) ("If the motion [to recuse] is denied, it may be reviewed for abuse of discretion on appeal from the final judgment."). The test for an abuse of discretion is whether the trial court acted without reference to any guiding rules or principles, or acted arbitrarily or unreasonably. *Carmody v. State Farm Lloyds,* 184 S.W.3d 419, 420–21 (Tex.App.-Dallas 2006, no pet.); *see Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985).

*Facts Adduced at Recusal Hearing*

Felix Michael Kubosh was a co-plaintiff with Pruett in the parallel federal litigation and was represented by Pruett's counsel, David Furlow, and his firm Thompson & Knight in that proceeding. Kubosh was in the audience at the fee hearing in the present case, and after Judge Kyle Carter court announced his ruling setting Pruett's fees at $35,000, Kubosh saw a white-haired gentlemen go over and shake the hand of the Board's counsel, Mr. Maher. Kubosh also saw "a lot of congratulatory gestures," but he did not testify that he overheard any conversations. Kubosh identified the white-haired gentleman as Judge Carter's father, Eric Carter. Kubosh later described this exchange to Furlow, who began looking into "why [Eric Carter] would have such an interest in the case."

Furlow soon learned about a case that his firm had been involved in styled *Essex*

*Crane Rental Corp. v. James McPherson, Sr.*, No. 2002–62464, in the 151st District Court of Harris County ("the Essex Litigation"), and that involved one of his former law partners, Tom Sankey. In the Essex Litigation, Sankey, a former Thompson & Knight partner, sued Eric Carter, alleging that Carter engaged in sham transfers of assets to perpetrate a fraud on Essex Crane Rental Corporation. The Essex Crane litigation was filed before Sankey began working at Thompson & Knight in July 2006, and Sankey took the case with him when he left the firm in February 2007.

Furlow also presented evidence of Judge Carter's participation in the Essex Litigation before taking the bench, which he contended showed Judge Carter's bias against Thompson & Knight. Specifically, Furlow argued that in September 2006, Judge Carter stated in a deposition that the Essex Litigation was "completely frivolous" and that he defended his father "on [his] own nickel." In September 2006, Judge Carter also requested sanctions against the plaintiff's attorneys in the Essex Litigation because the case was "filed in bad faith, [was] groundless, and [was] brought for purposes of harassing Carter." In February 2007, around the time Sankey left Thompson & Knight, Judge Carter on behalf of his father, filed a counter-claim in the Essex Litigation against Sankey, personally. And, in May 2008, after Sankey left Thompson & Knight, Judge Carter filed an appellees' brief in this Court on behalf of his father. In the appellee's brief, Judge Carter argued that Sankey "invented a vast conspiracy" and "attempted to manufacture circumstantial evidence to find [Eric Carter and his co-defendant] guilty of conspiracy."

Furlow presented evidence that he had never worked with Sankey while he was at Thompson & Knight and that he had no knowledge of the Essex Litigation or Judge Carter's involvement with it. Furlow also testified that one associate, Kenny Corley, had done a minor amount of work on the bail bond case and the Essex Litigation, but that his involvement in the bail bond case was limited to proofreading some briefs and conducting limited research on First Amendment issues. Furlow was concerned that the animosity in the Essex Litigation between Judge Carter, on the one side, and Sankey and Corley, on the other side, may have affected Judge Carter's ability to remain unbiased against Thompson & Knight in the present case.

*Analysis*

 Pruett argues that (1) the extremely low attorneys' fee award, coupled with (2) the history between Judge Carter and Thompson & Knight in the Essex Litigation "raises troubling issues of extrajudicial bias." The Board responds that Sankey brought the Essex litigation with him when he joined Thompson & Knight, took it with him when he left less than one year later, and that Judge Carter never filed claims against Thompson & Knight, but solely against Sankey, individually. The Board argues that "it is not at all apparent why the rather brief involvement of this large international law firm in the Essex Crane litigation would have engendered in Judge Carter an extrajudicial bias against the entire firm and its other clients."

We agree. Even though there was acrimony between Judge Carter and Sankey over the Essex Litigation, the administrative judge could have reasonably concluded that there was insufficient evidence extending this animosity to the firm that Sankey was a member of for less than a year. That Eric Carter "congratulated" the Board's attorneys after the fee hearing is also no evidence of Judge Carter's

bias—no conversation regarding the hearing was overheard, merely "congratulatory gestures."

Having reviewed the recusal hearing record, we do not conclude that the administrative judge acted arbitrarily or unreasonably, or without any reference to guiding rules and principles, in denying Pruett's motion to recuse.

Accordingly, we overrule point of error three.

## CONCLUSION

We reverse the judgment of the trial court and remand for further proceedings.